**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OTB HOLDING LLC, *et al.*,[1] | ) | Case No. 25-52415 (SMS) |
| | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF JONATHAN M. TIBUS IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Jonathan M. Tibus, declare under penalty as follows:

1.      I am the Chief Restructuring Officer ("CRO") of OTB Holding LLC ("OTB Holding") and all of its direct and indirect wholly-owned subsidiaries as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors" and, together with certain non-Debtor affiliates, "On The Border" or the "Company"). I was appointed CRO of On The Border in January of 2025.

2.      I am also a Managing Director at Alvarez & Marsal North America, LLC (together with employees of its affiliates—all of which are wholly-owned by its parent company and employees—its wholly-owned subsidiaries, and independent contractors, "A&M").

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: OTB Holding LLC (3213), OTB Acquisition LLC (8500), OTB Acquisition of New Jersey LLC (1506), OTB Acquisition of Howard County LLC (9865), Mt. Laurel Restaurant Operations LLC (5100), OTB Acquisition of Kansas LLC (9014), OTB Acquisition of Baltimore County, LLC (6963). OTB Holding LLC's service address is One Buckhead Plaza, 3060 Peachtree Road, NW, Atlanta, GA 30305.

3.      I have been a full-time restructuring advisor for 27 years.  I received a bachelor's degree from Florida State University and an MBA from The University of Florida.  I am also a Certified Insolvency and Restructuring Advisor with a Certification in Distressed Business Valuation and am a member of the American Bankruptcy Institute, the Association of Insolvency and Restructuring Advisors, and the Turnaround Management Association.

4.      I have been employed by A&M for 22 years.  A&M is a preeminent consulting firm with extensive experience and an excellent reputation for providing high quality, specialized management and restructuring advisory services to debtors and distressed companies.  A&M's core services include turnaround advisory services, interim and crisis management, revenue enhancement, claims management, and creditor and risk management advisory services.  A&M provides a wide range of debtor advisory services targeted at stabilizing and improving a company's financial position, including, developing or validating forecasts, business plans and related assessments of strategic position; monitoring and managing cash, cash flow, and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages.  Additionally, A&M provides advice on specific aspects of the turnaround process and helps manage complex constituency relations and communications.  A&M is known for its ability to work alongside company management and key constituents during chapter 11 restructurings.  Some notable, publicly disclosed restructuring assignments that I have personally advised on include Ignite Restaurant Group, Inc. (including its Joe's Crab Shack and Brickhouse Tavern restaurant brands), California Pizza Kitchen, Kona Grill, Real Mex Restaurants, Inc., Last Call Operating Co., Krystal Company, Quiznos, Max & Erma's,

Garden Fresh (d/b/a/ Souplantation and Sweet Tomatoes), and Red Lobster Management LLC (d/b/a Red Lobster).

5.    On March 4, 2025 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each commenced a case (the "Chapter 11 Cases") by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division (the "Court").  The Debtors are operating their business and managing their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the Northern District of Georgia (the "United States Trustee").  No trustee or examiner has been appointed in the Chapter 11 Cases.

6.    To minimize any adverse effects on their estates as a result of the commencement of these Chapter 11 Cases, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively the "First Day Pleadings"),[2] applications and other pleadings. Specifically, the Debtors are requesting, among other things, that the Court: (a) approve the Debtors' entry into a debtor-in-possession financing facility and use of cash collateral, which will provide the liquidity necessary for the Debtors to continue to operate their business during the Chapter 11 Cases; (b) authorize the Debtors to pay in full and in the ordinary course of business certain prepetition claims, including employee wage, benefit and expense reimbursement claims and the claims of certain vendors that provide goods and services to the Debtors; (c) authorize the

---

[2]    Unless otherwise defined here, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

Debtors to continue using their existing cash management system, including their existing bank accounts; and (d) authorize the implementation of certain administrative procedures to minimize any disruption to the Debtors' business as a result of the commencement of the Chapter 11 Cases. The First Day Pleadings are more fully described in **Part II** of this Declaration below.  The relief sought in the First Day Pleadings is crucial to preserve and maximize value for all stakeholders and will position the Debtors for success as they transition into chapter 11.

7.      I submit this declaration (the "Declaration") to provide an overview of the Debtors, their business, and the Chapter 11 Cases, as well as to support the Debtors' chapter 11 petitions and certain of the First Day Pleadings.  I have reviewed the Debtors' chapter 11 petitions and First Day Pleadings, or have otherwise had the contents explained to me, and it is my belief that the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value, (b) constitutes a critical element in achieving a successful reorganization of the Debtors, and (c) best serves the Debtors' estates and their creditors' interests.  The facts set forth in each First Day Pleading are incorporated herein by reference.

8.      Except as indicated otherwise, I have personal knowledge of the matters set forth herein and all facts set forth herein are based on my personal knowledge, discussions with current and former members of the Debtors' senior management and professional advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or

for my benefit in preparing this Declaration.  I am authorized to submit this Declaration on the Debtors' behalf, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

9.      The Declaration is divided into two parts.  **Part I** provides background information about the Debtors, their business operations, their corporate and capital structures, the events leading up to the filing of the Chapter 11 Cases, and the anticipated path of these Chapter 11 Cases. **Part II** sets forth the relevant facts in support of each of the First Day Pleadings.

## PART I

## BACKGROUND

### A.      The Debtors and Their Business Operations

10.      The Debtors operate the well-known restaurant brand "On The Border Mexican Grill & Cantina" ("On The Border"), which is engaged primarily in the development, operation and franchising of casual restaurants in the United States and South Korea.  Founded in Dallas, Texas in 1982, On The Border is known for its sizzling mesquite-grilled fajitas, award-winning margaritas, house-made salsa and endless chips and salsa.  In the past forty years, On The Border has steadily grown over time from a single cantina to one of the country's most well-known domestic and international Tex-Mex restaurant chains offering affordable, consistent, cultivated delicious menu items featuring bold flavors from Texas and Mexico.  With over eighty (80) restaurants in the U.S. and internationally, it's a favorite destination for fresh Tex-Mex food and vibrant good times.

11.      On The Border leverages its unique, authentic brand to differentiate itself from others in the casual dining sector.  As of the Petition Date, the Debtors continue to operate sixty

(60) restaurant locations across eighteen (18) states.  All sixty (60) of the Debtors' corporate-operated restaurant locations are leased.  In addition to the restaurants operated by the Debtors, On The Border has entered into franchise agreements whereby third-party franchisees operate twenty (20) additional restaurants in the United States and South Korea.  With certain exceptions, the franchisees of these restaurants generally remit 2.5% to 4% of sales as royalties to the Debtors.  In fiscal year 2024, franchised units generated approximately $1,832,000 in royalties.

12.    Originally known as "On The Border South Texas Café," the Company, in 1982, opened a single cantina with the goal of sharing bold, border-style food with its customers.  In 1994, twelve years after opening its doors, Brinker International ("Brinker") acquired On The Border and shortly thereafter opened its first franchise location.  By 2001, On The Border had over 100 domestic restaurant locations and, in 2007, expanded into South Korea with several franchised locations.

13.    In 2010, Brinker sold the Company and its 160 cantinas at the time to Golden Gate Capital, which in turn sold the Company to Border Holdings LLC, an affiliate of the Atlanta-based private equity firm, Argonne Capital Group, in 2014.  In 2020, Utz Brand acquired the right to manufacture chips and dips under the On The Border™ brand name from Truco Enterprises—demonstrating the powerful brand identity of the Company.

14.    As of the Petition Date, the Debtors employ approximately 2,800 employees, consisting of 375 full-time hourly employees, 2,210 part-time hourly employees and 216 full-time salaried employees.  OTB Holding LLC is based in Atlanta, Georgia.  Approximately forty (40) of the Debtors' employees work in On The Border's restaurant support center in Irving, Texas,

while the remaining employees work in the field at the Debtors' restaurants.  The Debtors have no unionized employees and are not party to any collective bargaining agreements.

15.    On The Border's business is labor intensive, and its workforce includes personnel who are intimately familiar with the Company's operations, processes, and systems.  The Company's employees perform a wide variety of functions that are critical to the Debtors' operations and cannot be easily replaced due to their unique skill and experience with core business segments.  The shrinking labor market of willing individuals and the costs associated with hiring replacements on an expedited basis further underscore the importance of the Company's current workforce.

**B.    Prepetition Capital Structure of the Debtors**

       **i.    Corporate Structure and Governance**

16.    An organizational chart illustrating the corporate structure of the Debtors is annexed hereto as **Exhibit A**.  None of the Debtors' equity securities are publicly traded.

17.    The equity ownership of the Debtors is as follows:

    (a)    <u>OTB Holding LLC</u>.  OTB Holding LLC is a Delaware limited liability company that is a wholly owned subsidiary of Border Holdings LLC.  OTB Holding LLC has no significant assets or operations other than its investment in OTB Acquisition LLC.

    (b)    <u>OTB Acquisition LLC</u>.  OTB Acquisition LLC is a Delaware limited liability company. OTB Holding LLC is the sole member of OTB Acquisition LLC.[3]

---

[3]    As depicted on the organizational chart attached hereto as **Exhibit A**, OTB Partner Interest, LLC, an affiliate of Argonne Capital, holds a profit interest in OTB Acquisition LLC. OTB Partner Interest, LLC is not a member of OTB Acquisition LLC but is entitled to a percentage of any distribution made by OTB Acquisition LLC pursuant to the terms of the operating agreement of OTB Acquisition LLC. The Debtors do not expect any such distributions to be made during these Chapter 11 Cases.

(c)      OTB Acquisition of New Jersey LLC.  OTB Acquisition of New Jersey LLC is a New Jersey limited liability company that is a wholly owned subsidiary of OTB Acquisition LLC. OTB Acquisition of New Jersey LLC has no significant assets or operations.

(d)      OTB Acquisition of Howard County LLC.  OTB Acquisition LLC owns 90% of the equity of OTB Acquisition of Howard County LLC and holds 100% of the Class A shares.  OTB Acquisition of Howard County LLC is a Maryland limited liability company and has no significant assets or operations.

(e)      Mt. Laurel Restaurant Operations LLC.  Mt. Laurel Restaurant Operations LLC is a New Jersey limited liability company that is a wholly owned subsidiary of OTB Acquisition LLC.  Mt. Laurel Restaurant Operations LLC has no significant assets or operations.

(f)      OTB Acquisition of Kansas LLC.  OTB Acquisition of Kansas LLC is a Kansas limited liability company that is a wholly owned subsidiary of OTB Acquisition LLC.  OTB Acquisition of Kansas LLC has no significant assets or operations.

(g)      OTB Acquisition of Baltimore County, LLC.  OTB Acquisition LLC owns 98% of the equity in OTB Acquisition of Baltimore County, LLC and holds 100% of the Class A shares.  OTB Acquisition of Baltimore County, LLC has no significant assets or operations.

18.      All of the Debtors' operating assets are owned by debtor OTB Acquisition LLC. Each of OTB Acquisition LLC's subsidiaries owns a liquor license used in connection with operation of an On The Border restaurant.

8

19.     The manager or managing member, as applicable, of each Debtor is the sole member of such Debtor or, in the case of OTB Acquisition of Howard County LLC and OTB Acquisition of Baltimore County, LLC, the holder of all Class A shares.

20.     OTB Holding LLC's principal place of business is in Atlanta, Georgia.   The restaurant support center for OTB Acquisition LLC and the remaining co-Debtors is in Irving, Texas.

**ii.     Prepetition Secured Debt**

21.     As of the Petition Date, the Debtors are party to two outstanding prepetition secured credit facilities and are subject to certain secured claims from various vendors.   The Debtors' outstanding prepetition funded debt obligations are in the amount of approximately $19,602,000 in the aggregate:

| Facility | Approximate Principal Outstanding |
|---|---|
| Prepetition Credit Facility | $11,750,000 |
| Prepetition Bridge Financing | $4,032,000 |
| U.S. Foods Secured Claims | $ 3,820,000 |
| **Total** | $19,602,000 |

**a.     Prepetition Credit Agreement**

22.     On September 9, 2022, Debtor OTB Acquisition LLC ("Acquisition"), CrossFirst Bank, as lender ("CrossFirst"), each of the other co-Debtors, entered into that certain Credit Agreement (as amended or otherwise modified from time to time, the "Prepetition Credit Agreement") which provides for a revolving loan facility with an aggregate commitment of $15,000,000, including a $3,000,000 sublimit for letters of credit (the "Prepetition Credit Facility").   The Debtors used the proceeds advanced under the Prepetition Credit Facility to,

among other things, fund (i) working capital and other general corporate expenses, (ii) the issuance

of letters of credit and (iii) the acquisition and development of restaurants.

23.    As of the Petition Date, CrossFirst is owed approximately $11,750,000 (inclusive

of fees and expenses) under the Prepetition Credit Agreement.  The outstanding obligations under

the Prepetition Credit Agreement are secured by a lien on substantially all of the Debtors' assets.

24.    Additionally, following certain defaults under the Prepetition Credit Agreement,

including the Debtors' failure to make required payments, the Debtors negotiated a forbearance

(the "Forbearance Agreement") with CrossFirst.  The Debtors and CrossFirst entered into that

Forbearance Agreement, dated as of February 14, 2025, pursuant to which CrossFirst agreed to

temporarily forbear from exercising its remedies under the Prepetition Credit Agreement until

March 5, 2025.

### b.    Bridge Financing

25.    In January 2025, the Debtors required additional working capital to (i) continue

operations and (ii) evaluate and pursue certain strategic alternatives in order to maximize the value

of the Debtors' assets for the benefit of all stakeholders.  The Debtors were in default under the

Prepetition Credit Agreement, and CrossFirst was unable to advance additional funds.  However,

CrossFirst was willing to subordinate their claims and liens to new bridge financing and potential

debtor-in-possession financing (subject to a cap).  As a result, the Debtors and their professionals

commenced a process to identify potential bridge funding to provide the Debtors with sufficient

liquidity to continue operations while they evaluate and pursue certain strategic alternatives,

including a potential chapter 11 filing, to maximize the value of the Debtors' assets for all

stakeholders.

26.     Following negotiations with two parties, on February 14, 2025, the Debtors entered into that certain Secured Promissory Note (the "Senior Secured Note") with OTB Lender LLC, as payee ("Bridge Lender").

27.     Pursuant to the Senior Note, Bridge Lender advanced the Debtors an amount equal to $4,000,000 ("Bridge Financing") pursuant to the terms of the Senior Secured Note.  The proceeds of the Bridge Financing were used to (i) fund operations while assessing strategic alternatives to maximize the value of the Debtors' assets and (ii) repay an overdraft balance in the Debtors' cash management system.  The Bridge Financing provided the Company with the liquidity it needed to salvage operations, maintain over 2,800 jobs for the Debtors' employees and, ultimately, continue a comprehensive marketing and sale process for the benefit of all stakeholders. The Senior Secured Note matures on April 5, 2025 and is secured by a first-priority lien on all assets of the Debtors.

28.     As of the Petition Date, the Bridge Lender is owed approximately $4,032,000 (inclusive of fees and expenses) under the Senior Secured Note.

29.     The Bridge Lender is an affiliate of Pappas Restaurants, Inc. and, as described further below, in connection with providing the Bridge Financing, expressed an interest in also submitting a proposal to buy substantially all of the Debtors' assets.

c.     **U.S. Foods**

30.     U.S. Foods, the Debtors' largest food vendor, has a claim that is secured by all of the Debtors' assets ("U.S. Foods Secured Claim").  The Debtors' estimate that the outstanding amount of the U.S. Secured Claim is approximately $3,820,000 as of the Petition Date. Pursuant

to the First Day Pleadings, the Debtors seek authority to pay the U.S. Foods Secured Claim in full in the ordinary course of business.

### iii.    General Unsecured Claims

31.    In the ordinary course of business, the Debtors incur obligations to vendors, suppliers, and trade counterparties, including, but not limited to, the amounts set forth in the First Day Pleadings and described in **Part II** of this Declaration in further detail.

## C.    Events Leading to Filing

32.    As detailed herein, these Chapter 11 Cases arose from a number of factors that affected the Debtors' performance and available liquidity, including a difficult macroeconomic environment, labor shortages, an underperforming restaurant footprint, and creditor enforcement actions.

33.    I was initially retained on January 9, 2025, as part of a team from A&M in which I served as chief restructuring officer and A&M provided additional personnel to the Company. We were initially tasked with (i) evaluating the Debtors' current business plan; (ii) identifying cost reduction and operation improvement opportunities and (iii) managing cash, cash forecasting and cash reporting requirements. The key observations from our financial and operational assessment are summarized below.

### i.    Inflationary Pressures and Labor Shortages

34.    On The Border has been weighed down in recent years by macroeconomic factors that have negatively impacted the Company. Casual dining restaurants are acutely impacted by consumer sensitivities to eating out versus staying in. And because of inflationary pressures, restaurant menu prices across the industry have risen significantly faster than grocery and other

consumer prices.  Typically, when labor inflation runs ahead of commodity inflation, restaurant prices tend to outpace grocery pricing.  As a result, consumers are less inclined to eat out.

35.      In addition to inflationary costs imposed on the labor force, 50% of states increased minimum hourly wages in 2024.  Restaurant average hourly wages have outpaced the restaurant industry's ability to increase prices, putting pressure on margins.  The Debtors have struggled in the last year to recruit and maintain a complete workforce, which diminishes the Debtors' ability to operate efficiently.

### ii.      Underperforming Locations

36.      As of the Petition Date, the Company is party to 113 active leases in connection with its restaurant locations, approximately of which a significant number relate to non-operational locations.  As described below, the Debtors seek to reject the leases for non-operational restaurants as of the Petition Date.  In 2024, the Company spent approximately $25,315,000 in lease obligations, over $11,878,000 of which relate to underperforming stores.  Given the Company's operational headwinds and financial position, payment of lease obligations associated with non-performing leases has caused significant strains on the Company's liquidity.

37.      The Debtors have already begun to reduce their cost structure without compromising quality by rationalizing the Debtors' restaurant footprint.  On or recently before February 24, 2025, the Debtors made the difficult decision or were otherwise required to close and vacate forty (40) stores.  Where possible, On The Border attempted to relocate employees of closed stores to a nearby location, and reorganized mid-level management accordingly.  These forty (40) stores were deemed to be non-performing because of rent costs and/or financial performance, such that operating those stores was deemed to be financially burdensome to the rest of the Company.

### iii.    Creditor Enforcement

38.    Due the Company's rapid loss of liquidity in the months preceding the filing, the Company was forced to quickly institute holds on vendor payments and rent payments to maintain cash.  Vendors and landlords unsurprisingly began to cut off service, withhold goods, repossess leased premises or exercise set-off rights when the Company began to hold vendor and rent payments.  This resulted in the Company losing stores, additional operational challenges, and a severe liquidity crisis.

### D.    Sale Process and The Chapter 11 Cases

39.    After thoroughly exploring all options available to the Debtors to raise capital or commence an alternative sale or recapitalization transaction, and in light of the added challenges facing the Debtors, including, a dire lack of liquidity, declining revenue and labor shortages, the managers and managing members of the Debtors (collectively, the "Managers"), as applicable, determined that commencement of the Chapter 11 Cases to implement a strategic asset sales strategy (the "Sale Strategy") under section 363 of the Bankruptcy Code is in the best interest of all stakeholders.

40.    In January 2025, the Debtors engaged Hilco Corporate Finance, LLC ("Hilco") for a potential marketing process to sell their assets on a going-concern basis, or to consummate another strategic, value-maximizing transaction that would resolve the Debtors' operational and financial challenges.  At the Debtors' direction, Hilco approached interested parties to secure a stalking horse bidder for the sale of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code.  In total, during the sale process, Hilco contacted 273 strategic and financial potential bidders

to serve as a potential stalking horse bidder, of which thirty-one (31) ultimately negotiated confidentiality agreements and were provided a confidential information memorandum.

41.    As noted above, in connection with this process, the Bridge Lender continued its diligence process and submitted a markup of an asset purchase agreement to acquire substantially all of the assets of the Debtors. This proposal contemplates that the Bridge Lender will also be the DIP Lender (as defined in the DIP Motion (defined below)) whereby it will submit a stalking horse credit bid. The Debtors continue to engage in negotiations with the DIP Lender regarding a stalking horse asset purchase agreement. Although the Debtors and the DIP Lender have not yet entered into a stalking horse asset purchase agreement, the Debtors are optimistic that they will do so in the coming days. Furthermore, the Debtors intend to seek higher or better bids and will continue a thorough marketing process for the sale of substantially all of their assets.

42.    The Debtors have targeted the following dates in order to satisfy the terms of the DIP Credit Agreement and continue a vigorous marketing process:

| Milestones | |
|---|---|
| | |
| Entry of Interim DIP Financing Order | **March 9, 2025**<br>(Petition Date + 5 Business Days) |
| Entry of Final DIP Financing Order | **April 3, 2025**<br>(Petition Date + 30 Days) |
| Entry of Bidding Procedures Order | **April 3, 2025**<br>(Petition Date + 30 Days) |
| Auction Held, if necessary | **May 7, 2025**<br>(Petition Date + 64 Days) |
| Proposed Sale Hearing | **May 9, 2025**<br>(Petition Date + 66 Days) |
| Entry of Sale Order | **May 9, 2025**<br>(Petition Date + 66 Days) |
| Sale Consummation | **May 24, 2025**<br>(Petition Date + 81 Days) |

43.     The Sale Strategy is the foundation of these Chapter 11 Cases and is critical to maximizing recoveries for all stakeholders.  Through its various First Day Motions, the Debtors are requesting this Court to permit the Chapter 11 Cases to move quickly and to culminate in a fair, open, and competitive section 363 sale auction.

## PART II

### FIRST DAY PLEADINGS

44.     The Debtor expects to file, and respectfully request that this Court approve, the First Day Pleadings.  I have reviewed each of the First Day Pleadings (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enable to Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their business or loss of productivity or value, and (b) constitutes a critical element in maximizing value during the Chapter 11 Cases.  Such representation is based upon information and belief, through my review of various materials and other information, and my experience and knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Pleadings.

45.     Contemporaneously herewith, the Debtors filed, and respectfully request that this Court approve, the First Day Pleadings.  I have reviewed each of the First Day Pleadings (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enable to Debtors to make the transition to, and operate in, chapter 11

16

with minimum interruption or disruption to their business or loss of productivity or value, and (b) constitutes a critical element in maximizing value during the Chapter 11 Cases.    Such representation is based upon information and belief, through my review of various materials and other information, and my experience and knowledge of the Debtors' operations and financial condition.  If called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Pleadings.[4]

46.    Several of the First Day Pleadings request authority to pay certain prepetition claims against the Debtors.  I understand that Bankruptcy Rule 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one (21) days following the filing of a chapter 11 case, except to the extent relief is necessary to avoid immediate and irreparable harm.  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims in those instances where the failure to pay would cause immediate and irreparable harm to the Debtors and their estates.

A.    **Procedural Motions**

*Notice of Designation of Complex Chapter 11 Case*

47.    The Debtors request the entry of an order designating the Chapter 11 Cases as complex cases.  The Debtors believe these cases qualify as complex Chapter 11 Cases because: (a) the Debtors have total assets of more than $25 million; (b) there are more than 100 parties in interest in these cases, excluding former and current employees; (c) the Debtors are not individuals; and (d) the Debtors do not own single asset real estate.

---

[4]    All capitalized terms used but not defined in Part II shall have the meaning ascribed to them in the applicable First Day Pleadings.

***Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>")***

48.    The Debtors request the entry of an order directing their bankruptcy cases be jointly administered for procedural purposes only under the caption of the case filed by OTB Holding LLC.

49.    The Debtors believe it will be more efficient for these cases to be jointly administered.  The Debtors anticipate that most hearings and contested matters will apply to all of the Debtors' cases equally.  Joint administration of the Debtors' Chapter 11 Cases will save the Debtors and their estates substantial time and expense by removing the need to prepare, replicate, file and serve duplicative notices, applications, and orders.  Further, joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets.  Consequently, joint administration of these cases will promote the economical and efficient administration of the Debtors' estates, unencumbered by the procedural problems otherwise attendant to the administration of separate, albeit related, cases.

50.    The Debtors also request the authority to file the monthly operating reports required by the United States Trustee Operating Guidelines on a consolidated basis.  This will further administrative economy and efficiency without prejudice to creditors or parties in interest.

***Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Prepare a Consolidated List of Creditors in Lieu of Submitting a Formatted Mailing Matrix, (B) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors and (C) Redact Certain Personal Identification Information for Individual Creditors; (II) Approving the Form and Manner of Notifying Creditors of the Commencement of These Chapter 11 Cases and Other Information; and (III) Granting Related Relief (the "Consolidated List of Creditors Motion")***

51.     The Debtors request authority to prepare and maintain a consolidated list of creditors (the "Creditor Matrix") in lieu of submitting a separate mailing matrix for each Debtor. Permitting the Debtors to maintain a consolidated list of their creditors in electronic format only, in lieu of filing a separate creditor matrix for each Debtor, is warranted under the circumstances of these cases.  Because the Debtors have thousands of potential creditors and other parties in interest, converting the Debtors' computerized information to a format compatible with the matrix requirements would be a burdensome task and would greatly increase the risk of error.

52.     The Debtors, working together with the Kurtzman Carson Consultants, LLC d/b/a Verita Global, the Debtors' proposed claims and noticing agent (the "Noticing Agent"), have prepared a single, consolidated list of the Debtors' creditors in electronic format.  The Debtors are prepared to make that list available in electronic form to any party in interest who so requests (or in non-electronic form at such requesting party's sole cost and expense) in lieu of submitting a separate mailing matrix for each Debtor to the Court's clerk's office.

53.     Additionally, the Debtors request the authority to redact address information of individual creditors—many of whom are employees—of the Debtors to the extent they appear on the Creditor Matrix because such information could be used to perpetrate identity theft.

54.     The Debtors also request authority to file a single consolidated list of their thirty (30) largest general unsecured creditors (the "Consolidated Top 30 List") pursuant to the *Second*

*Amended and Restated general Order 26-2019, Procedures for Complex Chapter 11 Cases*, dated February 6, 2023.  The Consolidated Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

55.     Finally, the Debtors request authority to establish certain procedures for providing notice to parties of the commencement of the Chapter 11 Cases and of other related information (the "Notice of Commencement").  In particular, the Debtors request authority for the Noticing Agent to serve the Notice of Commencement on all parties entitled to notice of commencement of the Chapter 11 Cases.  This will ensure that the Debtors' creditors and stakeholders receive prompt notice of the commencement of the Chapter 11 Cases and the Meeting of Creditors.

### *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File Schedules and Statements of Financial Affairs and (II) Granting Related Relief (the "Schedules Extension Motion")*

56.     The Debtors seek entry of an order granting the Debtors an additional thirty (30) days to file their schedules of assets and liabilities, schedules of current expenditures, schedules of executory contracts and unexpired leases and statements of financial affairs (collectively, the "Schedules and Statements").  To prepare the Schedules and Statements, the Debtors must gather information from books, records, and documents relating to a multitude of transactions. Consequently, collection of the necessary information requires the expenditure of substantial time and effort on the part of the Debtors' already over-burdened employees.  Given the size and complexity of the Debtors' business and financial affairs and the critical matters that the Debtors' management and professionals were required to address prior to the Petition Date, the Debtors were not in a position to complete the Schedules and Statements as of the Petition Date.

57.     For these reasons, the Debtors believe that they will be unable to compile all the information necessary for the preparation and filing of the Schedules and Statements within fourteen days after the entry of the order for relief, as required by Bankruptcy Rule 1007(c).  The Debtors' employees will begin working diligently to assemble and collate the necessary information.  The Debtors anticipate that they will need a minimum of thirty (30) additional days beyond those otherwise prescribed by the Bankruptcy Rules in order to prepare and file their Schedules and Statements in the appropriate format.

### *Emergency Application of Debtors for Entry of Order Authorizing the Retention and Employment of Kurtzman Carson Consultants LLC dba Verita Global as Claims, Noticing, Solicitation and Administrative Agent Effective As Of Petition Date* (the "<u>Verita Retention Application</u>")

58.     The Debtors seek authority to employ and retain Kurtzman Carson Consultants, LLC d/b/a Verita Global ("<u>Verita</u>") as claims and noticing agent in the Chapter 11 Cases.  I believe that such relief is prudent in light of the thousands of creditors, potential creditors, and parties in interest to whom certain notices will be sent.  Accordingly, I believe that the most effective and efficient manner by which to give notice and process claims in the Chapter 11 Cases is to engage Verita, an independent third party with significant experience in this role, to act as an agent of the Court.

59.     The Debtors and their advisors obtained and reviewed engagement proposals from two other claims and noticing agents to ensure a competitive process.  Verita is one of the country's leading chapter 11 administrators, with significant experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of Chapter 11 Cases.  I understand that Verita has substantial experience providing services, including claims and noticing services, in matters comparable in size and complexity to this matter.

60.     I believe that Verita's rates are competitive and reasonable given Verita's services and expertise.  Appointing Verita as the Debtors' Claims and Noticing Agent will maximize the efficiency of the distribution of notices and the processing of claims, as well as relieve the Clerk's Office of the U.S. Bankruptcy Court of the administrative burden of processing an overwhelming number of claims.

61.     As part of the overall compensation payable to Verita under the terms of the Retention Agreement, the Debtors have agreed to certain indemnification obligations as specifically enumerated in the Services Agreement.  The Debtors and Verita believe that the indemnification provisions contained in the Services Agreement are customary and reasonable for Verita and comparable firms providing claims, noticing, solicitation and related administrative service.

62.     Additional factual support is set forth in the Verita Retention Application and the declarations attached thereto.

## B.     Operational Motions

***Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Prepetition Bank Accounts, Cash Management System, Forms, and Books and Records and (II) Granting Related Relief* (the "<u>Cash Management Motion</u>")**

63.     The Debtors seek (a) the authority to maintain Bank Accounts and continue the use of existing Business Forms; (b) the authority, but not direction to continue using the Cash Management System; (c) to pay Bank Fees and Credit Processing Fees in the ordinary course of business; and (d) to modify certain Guidelines set forth by the U.S. Trustee and contained in Section 345(b) of the Bankruptcy Code.

64.     The Debtors use the Cash Management System in the ordinary course of business which permits the efficient collection and application of funds.  The Cash Management System is comprised of seventeen (17) Bank Accounts of which eleven (11) are maintained at CrossFirst and six (6) at Bank of America.  A list of the Debtors' Bank Accounts is attached to the Cash Management Motion as **Exhibit A** and a chart that illustrates how the Debtors' cash flow system operates at both CrossFirst and Bank of America is attached thereto as **Exhibit B.**

65.     A summary of the Debtors' Cash Management System and the Bank Accounts is contained below:

(a)     *Centralized Depository Accounts*.  The Debtors maintain four centralized depository accounts – two at CrossFirst with account numbers ending in 9413 and 9889, respectively (the "CrossFirst Centralized Depository Accounts"), and two centralized depository accounts at Bank of America with account numbers ending in 7427 and 7430, respectively (the "Bank of America Centralized Depository Accounts," and together with the CrossFirst Centralized Depository Account, the "Centralized Depository Accounts") into which all funds in the form of cash or check are deposited by Stores through armored car pickup one time per week and credit card and other electronic payment deposits are deposited daily.  Each of these are zero balance accounts.  All funds in the Centralized Depository Account are swept to the applicable Concentration Account (as defined below) on a daily basis.

(b)     *Concentration Accounts*.  The Debtors maintain one operating account at CrossFirst with account number ending in 8043 (the "CrossFirst Concentration Account") and one operating account at Bank of America with account number ending in 7443 (the "Bank of America Concentration Account," and together with the CrossFirst Concentration Account, the "Concentration Accounts").  Approximately sixty percent (60%) of the Debtors' receipts are deposited directly into the CrossFirst Concentration Account.  Of the remaining revenues, the majority are deposited into one of the CrossFirst Centralized Depository Accounts and swept daily into the CrossFirst Concentration Account.  However, the revenues for ten (10) stores are initially deposited into one of the Bank or America Depository Accounts are swept daily into the Bank of America Concentration Account.  Funds are transferred out of the Concentration Accounts, as needed, to fund nearly all of the Debtors' disbursements.  The funds in the Bank of America Concentration Account are only used to pay vault orders from one of the Bank of America Centralized Depository Accounts (#7430), liquor costs and bank fees.  When the cash reserve in the Bank of America Concentration Account exceeds the anticipated needs for payment of

such expenses, the Debtors manually transfer the excess funds into the CrossFirst Concentration Account.

(c)     *CrossFirst Disbursement Accounts*.  The vast majority of disbursements (other than payroll and real and personal property taxes) are generally made out of two disbursement accounts at CrossFirst with account numbers ending in 3533 and 8675, respectively (the "CrossFirst Disbursement Accounts").  The funds needed for disbursement are swept daily from the CrossFirst Concentration Account to the appropriate CrossFirst Disbursement Account and thereafter disbursed to cover accounts payable (other than payroll and real and personal property taxes).  One of the CrossFirst Disbursement Accounts disburses via check only and the other CrossFirst Disbursement Account disburses via wire, ACH, or other electronic payments.

(d)     *Bank of America Disbursement Account*.  The Debtors maintain one operational disbursement account at Bank of America with account number ending in 2463 (the "Bank of America Disbursement Account").  The Bank of America Disbursement Account is a checking account that is used to pay cash on hand deliveries for all of the Debtors' stores.

(e)     *Payroll Account*.  The Debtors maintain a Payroll Account with CrossFirst with account number ending in 4532 (the "Payroll Account").  The Payroll Account is a zero balance account that funds wages of the Debtors' employees.  Funds in the Payroll Account are received through cash transfers from the CrossFirst Concentration Account in amounts sufficient to cover such wage obligations during a given pay period.  The Debtors' payroll processor sweeps the funds in the Payroll Account prior to each pay period and processes payroll.  Additionally, (i) the Internal Revenue Service and (ii) Rain Technologies Inc., the administrator for the Debtors' "Early Wage Access" program, will sweep from the Payroll Account for purposes of satisfying year-end payroll tax obligations and early wage access liabilities, respectively.  Any excess funds are manually transferred back into the CrossFirst Concentration Account at the end of each pay period.

(f)     *Miscellaneous Accounts*.  The Debtors also maintain the following miscellaneous accounts: (i) a disbursement account held at CrossFirst used to fund real and personal property taxes; (ii) a depository account at CrossFirst that holds funds collected through the Debtors' "OTB Better Together Fund"; (iii) an adequate assurance account that the Debtors intend to hold funds to provide adequate assurance to the Debtors' utility service providers; and (iv) four zero balance accounts held at CrossFirst and Bank of America, respectively, that are no longer used and maintain a zero-balance.

66.     The Debtors' existing Bank Accounts function smoothly and permit the efficient

collections and disbursements of cash for the benefit of the Debtors and all parties in interest.  The

Debtors' transition into chapter 11 will be significantly less disruptive if the Bank Accounts are

24

maintained following the commencement of these cases with the same account numbers and, where applicable, automated relationship.

67.    <u>Bank Fees</u>.  In the ordinary course of business, the Debtors incur periodic service charges and other fees in connection with maintaining the cash management system (collectively, the "<u>Bank Fees</u>").  The Debtors estimate that they owe approximately $20,450 in unpaid Bank Fees as of the Petition Date.  By the Cash Management Motion, the Debtors seek the authority to continue to pay the Bank Fees, including the prepetition Bank Fees, in the ordinary course of business on a postpetition basis.

68.    <u>Credit Card Processing Fees</u>.   The Debtors accept credit cards at all of their restaurants.  Credit card payments received at each restaurant are processed by either NCR Voyix Corporation ("<u>NCR</u>") or Fiserv, Inc. ("<u>FiServ</u>", and together with NCR, the "<u>Credit Card Processors</u>").   NCR processes all credit card transactions for in-store payments and FiServ processes all credit card transactions for catering and online ordering.  The Debtors' continued ability to honor or process credit card transactions is essential to their efforts to maintain the operation of their business and maximize value to their estates.  Without this ability, the Debtors would lose the ability to conduct sales transactions in the ordinary course of business.  Pursuant to the terms of the Debtors' agreements and relationships with the Credit Card Processors, the Debtors are required to pay certain fees for credit card processing services (collectively, the "<u>Processing Fees</u>").  The Credit Card Processors net the Processing Fees from the credit card receipts.  As a result, the Debtors do not expect any Processing Fees to be outstanding as of the Petition Date. By the Cash Management Motion, the Debtors seek the authority to continue to pay

the Processing Fees, including any prepetition obligations, in the ordinary course of business to avoid any interruption of the Debtors' ability to process credit card transactions.

69.     <u>Existing Business Forms and Checks</u>.   In the ordinary course of business, the Debtors maintain blank check stock and use a system, which is pre-programmed by a third party, to print the Debtors' names thereon.  In addition, the Debtors maintain pre-printed correspondence and business forms, including, but not limited to, letterhead, envelopes, promotional materials and other business forms (collectively, along with the Debtors' checks, the "<u>Business Forms</u>").  To minimize administrative expense and delay, pursuant to Procedure K(1) of the Complex Case Procedures, the Debtors request authority to continue to use the Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to each Debtor's "Debtor in Possession" status.

70.     <u>Requested Modification of Certain U.S. Trustee Guidelines</u>.  I understand that the Office of the U.S. Trustee for Region 21 (the "<u>U.S. Trustee</u>") has established guidelines (the "<u>Guidelines</u>") to supervise the administration of chapter 11 cases and prevent postpetition payments for prepetition claims.  The Guidelines require a chapter 11 debtor to, among other things: (i) close its existing books, records and bank accounts, and open new postpetition books, records and bank accounts (which must bear debtor in possession labels, and must be opened at banks approved by the U.S. Trustee); (ii) establish separate bank accounts for operations, payment of taxes, cash collateral and payroll (to the extent that the debtor had a separate payroll account prepetition); and (iii) obtain new checks bearing the designation "Debtor in Possession," along with additional information.

71.     By the Cash Management Motion, the Debtors seek a modification of the deposit guidelines set forth in section 345(b) of the Bankruptcy Code and the Guidelines to permit the Debtors to maintain their existing Bank Accounts and Cash Management System.  As depicted on **Exhibit B** of the Cash Management Motion, the majority of the Debtors' Bank Accounts are maintained at CrossFirst, which is not an approved depository in compliance with section 345(b) of the Bankruptcy Code or the Guidelines.  However, treasury management needs require the Debtors to maintain certain Bank Accounts with CrossFirst.  The Debtors remaining accounts are held at Bank of America, which is included on the U.S. Trustee's approved depository list and thereby complies with the approved depository requirements of section 345(b) of the Bankruptcy Code.  Thus, the Debtors believe that any funds that are deposited in the Bank Accounts are secure.

72.     The Debtors' Bank Accounts comprise an established Cash Management System that the Debtors need to maintain in order to ensure that collections and disbursements from the Bank Accounts are not disrupted.  The Debtors rely upon each of the Banks because there is not one single financial institution with branches near each of the Debtors' restaurant locations.  The Debtors will note, in their respective records, the date and times the chapter 11 petitions were filed, and the records will reflect each postpetition receipt and disbursement.  Accordingly, the Debtors request that their existing accounts be deemed DIP accounts, and that their maintenance and continued use be authorized.

73.     Moreover, all the Debtors' Bank Accounts are located in the United States and are insured by the FDIC.  To the extent that any of the Debtors' Bank Accounts are located at financial institutions that are not an authorized depository, there is only one account (the CrossFirst Concentration Account) that will exceed the FDIC insurance limit of $250,000 for more than a

twenty-four (24) hour period. Thus, the Debtors believe that any funds that are deposited in the

Bank Accounts are secure, and, therefore, the Debtors are in compliance with Bankruptcy Code

section 345 with respect to such Bank Account.

### *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Payment of Prepetition Wages, Payroll Taxes, Certain Employee Benefits, and Related Expenses; (II) Directing Banks to Honor Related Prepetition Transfers; and (III) Granting Related Relief* (the "Wages Motion")

74.     The Debtors seek authority, but not direction, to pay the Employee Obligations that

become due and owing during these chapter 11 cases and to continue their practices, programs and

policies that were in effect as of the Petition Date. The Debtors request that all banks and other

financial institutions be authorized and directed, when requested by the Debtors and in the Debtors'

sole discretion, to receive, process, honor and pay any and all checks drawn on the Debtors'

accounts to pay the Employee Obligations, provided that sufficient funds are available in the

applicable accounts to make the payments and transfers. The Debtors similarly request that they

be authorized, but not directed, to pay any cost or penalty incurred by their Employees in the event

that a check issued by the Debtors for payment of the Employee Obligations is inadvertently not

honored because of the filing of the Debtors' bankruptcy cases. Though the Debtors estimate any

such costs or penalties to be *de minimis* in amount, if the Debtors are not authorized to pay such

costs or penalties, then their Employees will suffer the exact type of harm that the Wages Motion

seeks to prevent and the Debtors will suffer from loss of employee goodwill.

75.     The Debtors maintain various compensation and benefits programs and pay various

administrative fees and premiums in connection therewith, an estimate of prepetition obligations

related to the Compensation and Benefits Program and the monetary relief sought in relation is

summarized in the chart in the Wages Motion.

76.     As of the Petition Date, the Debtors employ approximately 2,800 people (the "Employees"), of which approximately forty (40) operate out of their restaurant support center located in Irving, Texas.  Of the Employees, 216 are full-time salaried Employees ("Full-time Salaried Employees"), 375 are full-time hourly Employees ("Full-time Hourly Employees", and together with the Full-time Salaried Employees, "Full-time Employees"), and 2,210 are part-time hourly Employees ("Part-time Employees").

77.     The Debtors employ six (6) independent contractors (the "Independent Contractors", and together with the Employees, the "Workforce") to provide accounting, accounts payable, tax reporting and other services.  The Independent Contractors are an important component of the Debtors' enterprise and operations.

78.     The Debtors' businesses are labor intensive and hyper-sensitive to fluctuations in the labor market.  In particular, the economy has been marked by escalating wage pressures.  The Debtors' Workforce includes personnel who are intimately familiar with the Debtors' business, processes, and systems, and possess unique skills and experience with the core business segments of the Debtors.  Many of the Employees have developed relationships with customers and vendors that are essential to the Debtors' business.  The Debtors' Employees perform a wide variety of functions that are critical to the Debtors' operations and cannot be replaced easily due to the shrinking labor market of willing individuals and the cost associated with hiring replacements on an expedited basis.  During these times of turbulent shifts in the labor market, failure to maintain the continued, uninterrupted services of their Workforce would materially and adversely impair the Debtors' efforts to operate inside a chapter 11 proceeding and jeopardize the value of their businesses as a going concern.

79.     As described more fully below, in the ordinary course of business the Debtors have incurred certain prepetition employee obligations that remain unpaid as of the Petition Date. Even though arising prior to the Petition Date, these obligations (collectively, the "Employee Obligations") will become due and payable in the ordinary course of the Debtors' business on and after the Petition Date.[5]  These obligations are described as follows:[6]

(a)     *Wages, Salaries, and Other Compensation.*  Wages, salaries, and other compensation consist of prepetition wages and salaries owed to the Debtors' Employees (the "Payroll Obligations"). The Debtors pay the majority of the Employees on a bi-weekly basis ("Bi-weekly Payroll") with a small group of Employees paid on a weekly basis ("Weekly Payroll"). The last Bi-Weekly Payroll was run on March 4, 2025 and the last Weekly Payroll was run on March 4, 2025. The average monthly gross Payroll Obligations in 2024 were approximately $4,240,000. As of the Petition Date, the Debtors estimate that they owe approximately $990,000 on account of the Payroll Obligations.[7]  None of the Employees are owed Payroll Obligations as of the Petition Date in an amount exceeding the $15,150 priority cap imposed by section 507(a)(4) of the Bankruptcy Code. The Debtors request authority to pay the outstanding prepetition Payroll Obligations due to Employees and to continue to pay such obligations in the ordinary course of business.

(b)     *Independent Contractors' Compensation.*  These obligations consist of amounts owed as compensation to six (6) Independent Contractors ("Independent Contractor Compensation"). The average monthly gross amount of these obligations is approximately $110,000. As of the Petition Date, the Debtors estimate that they owe approximately $62,000 to the Independent Contractors ("Independent Contractor Compensation"). The Debtors request authority to pay the outstanding prepetition Independent Contractor Compensation due to Independent Contractors and to continue to pay such obligations in the ordinary course of business.

(c)     *Payroll Processing.*  The Debtors utilize Paycor, Inc. ("Paycor") to administer payroll and several other employee-related benefits programs. Paycor provides, among other things, the Debtors' payroll processing system, ensures proper tax and benefits withholding and garnishment of wages. The majority of Employees receive the

---

[5]     No amount proposed to be paid to any individual Employee will exceed the priority unsecured cap of $15,150 set forth in 11 U.S.C. §507(a)(4) and (5).

[6]     In addition to the benefits described herein, the Debtors maintain a workers' compensation plan, which is discussed in the Debtors' *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Continue Prepetition Insurance and Workers' Compensation Policies and to Pay Prepetition Premiums and Related Obligations; and (II) Granting Related Relief.*

[7]     This amount excludes prepetition severance obligations (if any).

tips directly at the end of the shift and are responsible for reporting for tax purposes.  At three (3) of the Debtors' locations, the Debtors pay tips at the end of the following business day via a digital wallet serviced by Instant Financial ("Instant").  The Debtors do not incur any obligations in connection with the services provided by Instant.  On average, the Debtors pay Paycor administration fees of approximately $500,000 (the "Payroll Processing Fees") each year.  As of the Petition Date, the Debtors estimate that they owe Paycor approximately $60,000 in Payroll Processing Fees.  The Debtors request authority to pay the outstanding prepetition Payroll Processing Fees due to Paycor and to continue to pay such obligations in the ordinary course of business.

(d)    *Payroll Taxes*.  The Debtors are required by law to withhold from U.S. Employees' paychecks amounts related to, among other things, federal, state, and local income taxes and social security and Medicare taxes (the "Payroll Taxes").  The Payroll Taxes include the amounts owed by the Employees that the Debtors withhold from the gross amount of the Employees' wages or salary as well as the amounts separately owed by the Debtors.  The Debtors' average Payroll Taxes for each payroll in 2024 were approximately $720,000 in the aggregate.  This includes approximately $270,000 for the employer obligation, and approximately $450,000 employee components.  As of the Petition Date, the Debtors estimate that they owe approximately $470,000 in employer and employee prepetition Payroll Taxes in the aggregate.  This amount is not included in the Payroll Obligations described in the paragraph above.  The Debtors request authority to pay the outstanding prepetition Payroll Taxes and to continue to pay such obligations in the ordinary course of business.

(e)    *Holiday, Vacation and Sick Day Programs*.  These obligations consist of time off for vacation, illness, company holidays and other forms of paid leave (collectively, "Paid Leave").

(i)    *Sick Days*.  Employees receive sick days as required by applicable non-bankruptcy law.

(ii)    *Vacation*.  Full-time Employees receive paid vacation ("PTO") based on years of service and seniority level.  Full-time Employees receive annual PTO as follows: (i) after one (1) year of employment, Full-time Employees receive 10 days of PTO; (ii) after five (5) years of employment, Full-time Employees receive 15 days of PTO; and (iii) after 10 years of employment, Full-time Employees receive 20 days of PTO.  On rare occasions, the Debtors negotiate an individualized PTO policy with an Employee.  Each pay period Full-time Employees accrue a portion of their PTO as set forth above.  Up to 40 hours of PTO are eligible for carry over to the next fiscal year.

(iii)    *Other Paid Leave*.  The Debtors' offer certain scheduled or calendared holidays throughout the year, Paid Leave under the Family and Medical Leave Act and other paid leave for personal reasons, many of which are required by law, including statutory sick leave, workers' compensation leave, missed work

time in the ordinary course of business for bereavement leave, military leave, jury or court attendance, and time spent voting.

The Debtors desire to continue to honor their obligations for holidays, sick days and PTO on a going forward basis. As of the Petition Date, the Debtors estimate that their Employees have earned or accrued approximately $490,000 in the aggregate of unused PTO. This amount is not included in the total Payroll Obligations described above. By way of the Wages Motion, the Debtors seek authority, but not direction, to pay as they come due any "cash out" amounts with respect to earned or accrued but unused PTO only when required by applicable non-bankruptcy law, and to continue to administer the Paid Leave policies in the ordinary course of business. The other forms of Paid Leave do not involve incremental cash outlays beyond standard payroll obligations.

(f)    *Qualified 401(k) Plan Obligations.* The Debtors maintain a 401(k) plan (the "401(k) Plan") under which eligible Employees can make pre-tax payroll contributions to their 401(k) accounts ("401(k) Contributions") up to the maximum amount permitted by the Internal Revenue Code. The 401(k) Plan is administered by Economic Group Pension Services ("EGPS"). Under the 401(k) Plan, the Debtors match 100% of each participating Employee's contributions for the first 3% of the participating Employee's salary, and 50% of each participating Employee's contributions for the next 2% of the Employee's salary with such match to not exceed 4% of the 401(k) Contributions in the aggregate (the "401(k) Match", and together with the 401(k) Contributions and any administrative and service fees, the "401(k) Obligations"). Each participating Employee's 401(k) Contributions are deducted automatically from their weekly or bi-weekly paychecks, as applicable.

Approximately 200 Employees in total participate in the 401(k) Plan. On account of these participating Employees, the Debtors withhold and remit to EGPS approximately $31,000 every two weeks on account of 401(k) Plan Contributions, and the Debtors remit to EGPS approximately $15,000 every two weeks on account of 401(k) Matches.

The Debtors also provide a 401(k) loan reimbursement program ("401(k) Loan Reimbursement Program") whereby participating Employees are able to borrow from their 401(k) account up to a certain amount. If the loan is not timely repaid then the Employee will be required to pay taxes on account of the outstanding balance of the 401(k) loan. The Debtors to do not incur any obligations in connection with the administration of the 401(k) Loan Reimbursement Program.

Because the Debtors' payroll is paid in arrears, as of the Petition Date the Debtors estimate that they owe approximately $17,000 in accrued 401(k) Contributions that have not yet been remitted to EGPS and owe $8,000 in 401(k) Matches. As of the Petition Date, the Debtors do not believe that any amounts are due and payable to EGPS approximately on account of administrative fees in connection with the 401(k) Plan. However, out of an abundance of caution, by the Wages Motion, the Debtors seek authority, not direction, to

pay prepetition 401(k) Obligations in the ordinary course of business on a postpetition basis.

(g)   *Expense Reimbursement and Other Benefits (collectively, the "Reimbursable Expenses")*.

(i)   *General Reimbursement*.   The Debtors reimburse eligible Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors.  These reimbursement obligations include such things as mileage reimbursement, meals, travel expenses, relocation expenses and office supply reimbursements.   The average monthly amount of these reimbursement obligations is approximately $50,000.  As of the Petition Date, the Debtors estimate that they owe approximately $25,000 in expense reimbursements. This amount is not included in the total Payroll Obligations above.

(ii)   *Car and Cellphone Allowance*.   Additionally, (i) certain operators receive monthly car allowance payments, and (ii) certain Employees are provided cell phone allowance payments.  Each allowance is an annual amount that is divided evenly among twenty-six (26) pay cycles.  The Debtors' payments on the car allowances and cell phone allowances, including any related administrative fees, total approximately $18,000 with respect to the monthly car allowances and $5,000 each month with respect to monthly cellphone allowances.

(iii)   *Corporate Credit Cards*.  The Debtors provide certain Employees with pre-funded corporate credit cards (the "Corporate Credit Cards"), which Employees can use to make work-related purchases.   Approximately 160 Employees have been issued Corporate Credit Cards, each of which was issued to such Employees in the Debtors name with Elan Financial Services ("Elan").  In 2024, the Debtors funded approximately $1,910,000, in the aggregate, to Elan on account of the Corporate Credit Cards.  The Debtors' pre-fund the Corporate Credit Cards and, to the extent insufficient funds exist for any purchase, the purchase will be declined.  As a result, the Debtors do not anticipate any outstanding obligations under the Corporate Credit Cards as of the Petition Date.  However, out of an abundance of caution, the Debtors seek authority, but not direction, to continue the Corporate Credit Card program, paying Corporate Credit Card expenses, each in the ordinary course of business, and to honor any outstanding obligations related to the Corporate Credit Cards, regardless of whether they arose before or after the Petition Date.

The Debtors seek authority, but not direction, to continue reimbursing Employees for the Reimbursable Expenses, regardless of whether they arose before or after the Petition Date.  As of the Petition Date, the Debtors estimate that they owe approximately $48,000 on account of Reimbursable Expenses.

(h)     *HSA and FSA Accounts.*  Eligible Employees of the Debtors are eligible for certain tax advantaged accounts through the Debtors.

(i)     <u>HSA Account</u>.  The Debtors offer eligible Full-time Employees the option of contributing a portion of their pre-tax wages into tax-exempt health savings accounts ("<u>HSA</u>") that can be used to pay qualified health care expenses. Currently, approximately 100 Employees contribute to the HSAs.  As of the Petition Date, the Debtors are unaware of any obligations outstanding in connection with the HSA.  The Debtors request the authority to maintain the HSA program in the ordinary course of business regardless of whether any qualified expenses were incurred before or after the Petition Date.

*(ii)     <u>FSA Accounts</u>.*  The Debtors also offer eligible Full-time Employees the alternative option of contributing a portion of their pre-tax wages into tax-exempt Limited Flexible Spending Accounts ("<u>FSA</u>") that can be used to reimburse qualified health care or dependent care expenses.  Currently, approximately 100 Employees contribute to the FSAs.  The Debtors pay certain fees to Insolved Inc. ("<u>Insolved</u>"), for administration of the FSAs.  In 2024, the Debtors paid Insolved approximately $6,000 in total administrative fees for the FSAs.  As of the Petition Date, the Debtors estimate that they owe approximately $500 on account of administrative fees for the FSA program.  The Debtors request the authority to maintain the FSA program in the ordinary course of business regardless of whether the qualified expenses were incurred before or after the Petition Date.

(i)     *Health and Welfare Benefits.*  The Debtors provide several health and welfare benefit plans for their Employees, including insurance plans relating to medical, vision, dental, disability, and life insurance (collectively, the "<u>Employee Health and Welfare Benefits</u>").  The Debtors' estimated average monthly costs in the aggregate on account of the Employee Benefits for 2025 is $870,500, of which approximately $725,500 is paid by the Debtors.  By way of comparison, the average monthly costs of the plans in aggregate were $755,652 in 2024.

(i)     <u>Medical Plans</u>.  The Debtors maintain and provide two self-insured medical care and prescription drug plans for their Full-Time Employees (collectively, the "<u>Full-Time Medical Plans</u>"), each through United Healthcare. Eligible Employees may enroll in one of two Full-Time Medical Plans offered to them immediately upon employment.  The Debtors pay between 60% and 70% of the premiums depending on the applicable Full-Time Medical Plans and the balance of the premium is deducted from the Employees' paychecks.  The total cost of the Full-Time Medical Plans premiums is approximately $462,000 per month, of which approximately $287,000 is paid by the Debtors.  As of the Petition Date, the Debtors estimate that they owe approximately $130,000 on account of prepetition premiums for the Full-Time Medical Plans.  This amount is not included in Payroll Obligations above.

- *COBRA*.  The Debtors' healthcare costs include health insurance for current and former Employees.  There are seven (7) former Employees covered under COBRA (covered 18 months from departure).  The Debtors do not pay for any expenses (including administrative fees) to cover Employees under COBRA.

- *Medical Benefit Claims*.  The Debtors partially subsidize the Employee Benefits with Employee-contributions withheld from gross pay.  The Debtors pay for all approved medical and other claims ("Medical Benefit Claims") up to $175,000 per Medical Benefit Claim and any Medical Benefit Claims in excess of such amount will be covered by stop loss coverage provided by Stealth Partners.  The Debtors are unable to ascertain with certainty the prepetition amounts due and outstanding on account of the Medical Benefits Claims because such claims are submitted and processed at varying times.  The average monthly amount of all Medical Benefit Claims in 2024 was approximately $433,000 per month.  Based on historical trends, the Debtors estimate that as of the Petition Date they owe approximately $128,000 on account of prepetition Medical Benefit Claims.

In 2024, the Debtors' average monthly costs in the aggregate on account of the Full-Time Medical Plans and COBRA was approximately $740,000.  As of the Petition Date, the Debtors owe approximately $200,000 on account of the Full-Time Medical Plans and COBRA and hold approximately $50,000 in premiums collected from Employees but not yet remitted to United Health Care.

(ii)    *Dental Plan*.  Eligible Employees are given the opportunity to participate in a dental plan administered by Delta Dental (the "Dental Plan").  The Debtors pay between 14% and 20% of the premiums for the Dental Plan and self-insure claims up to 80% - 90% per claim.  The total cost of the Dental Plan is approximately $53,000 per month in the aggregate, of which approximately $5,000 is paid by the Debtors.  As of the Petition Date, the Debtors estimate that they owe approximately $2,000 in the aggregate on account of prepetition premiums and claims for the Dental Plan.  This amount is not included in Payroll Obligations above.

(iii)    *Basic Life Insurance*.  The Debtors provide life insurance to eligible salaried and hourly Employees through Lincoln Financial ("Lincoln Financial") at no cost to the Employee, which includes an employee assistance program. Salaried Employees receive coverage up to two-times their annual salary and Full-Time Hourly employees receive $5,000 in coverage.  The Debtors' average monthly premium is approximately $12,000  As of the Petition Date, the Debtors estimate that they owe approximately $6,000 on account of basic life insurance.

(iv)  *Long-Term Disability*.  Certain of the Debtors' Employees are eligible to participate in a long-term disability insurance plan that is fully insured by the Debtors and administered by Lincoln Financial ("Long-Term Disability Insurance Plan").  On an average annual basis, the total cost of the Long-Term Disability Insurance Plan is approximately $5,000 per month, all of which is covered by the Debtors.  As of the Petition Date, the Debtors estimate that they owe approximately $2,500 on account of amounts in connection with the Long-Term Disability Insurance Plan.

(v)  *Salary Continuation*.  The Debtors provide a salary continuation program for eligible Employees during an approved leave of absence ("Salary Continuation Program").  The approval of salary continuation is contingent on an Employee satisfying the requirements under the Family and Medical Leave Act.  On an average annual basis, the total cost of the Salary Continuation Program is approximately $8,500 per month.  As of the Petition Date, the Debtors estimate that they owe approximately $2,200 on account of amounts in connection with the Salary Continuation Program.

**The following are "pass through" programs for which the Debtors make no contributions or payments.  The Debtors withhold the necessary amounts from the Employee's paycheck and remit the amounts to the benefit provider.  Accordingly, the Debtors ask for authority to remit amounts collected from the Employees prior to the Petition Date but not yet remitted to the carrier.**

(vi)  *Vision Plan*.  Eligible Employees are given the opportunity to participate in a vision plan administered by EyeMed Vision Care LLC (the "Vision Plan").  The premiums for the Vision Plan are covered fully by the Employee.  As of the Petition Date, in connection with the Vision Plan, the Debtors hold approximately $1,900 in premiums collected from Employees but not yet remitted to the carrier.  This amount is not included in the total Payroll Obligations above.

(vii)  *Additional Life and AD&D Insurance*.  The Debtors permit all eligible Employees to purchase supplemental life insurance and AD&D insurance. The Debtors collect funds from the Employees and remit to the insurance company, but do not provide any reimbursement for this program.  There is no material cost to the Debtors for this program.  As of the Petition Date, in connection with the AD&D insurance, the Debtors hold approximately $3,900 in premiums collected from Employees but not yet remitted to the carrier.  This amount is not included in the total Payroll Obligations above.

*(viii)  MEC Plan and Hospital Indemnity Plan*.  The Debtors also provide a minimum employment coverage plan ("MEC Plan") and hospital indemnity plan ("Hospital Indemnity Plan"), each through United Healthcare, that eligible Part-Time Employees can participate in.  The premiums for these MEC Plan and Hospital Indemnity Plan are fully paid by the Employee.  The Debtors do not incur

any obligations on account of the MEC Plan and Hospital Indemnity Plan.  As of the Petition Date, in connection with the MEC Plan and Hospital Indemnity Plan, the Debtors hold approximately $6,600 in premiums collected from Employees but not yet remitted to the carrier.  This amount is not included in the total Payroll Obligations above.

(ix)    *Supplemental Long-Term Disability Insurance*.  Employees are provided the opportunity to purchase supplemental long-term disability coverage, but such coverage is solely paid for by the Employee.  The Debtors collect funds from the Employees and remit the funds to the insurance company, but do not provide any reimbursement for the programs.  As of the Petition Date, in connection with supplemental long-term disability insurance coverage, the Debtors hold approximately $3,800 in supplemental long-term disability insurance premiums collected from Employees but not yet remitted to the carrier.  This amount is not included in the total Payroll Obligations above.

(j)    *Non-Insider Incentive Programs*.  The Debtors have maintained, in the ordinary course of business, certain incentive programs to motivate and reward certain of their non-insider Employees, preserve Employee morale, and incentivize the Employees to hit specific performance metrics (collectively, the "Non-Insider Employee Incentive Programs").  Awards under the Non-Insider Employee Incentive Programs are calculated based on specific performance metrics and timelines established pursuant to the applicable program and distributed at the discretion of the Company.  As stated above, none of the participants that may receive payment under the Non-Insider Employee Incentive Programs is an Insider—they are Employees that report directly or indirectly to an executive and do not make or participate in making any corporate-level decisions and policies.

(i)    *Manager and Area Director Incentive Plan*.  Restaurant managers ("Managers") and area directors ("Area Directors") are eligible to participate in a performance incentive plan ("Manager and AD Incentive Plan").  To be eligible to receive payment under the Manager and AD Incentive Plan, an eligible Manager or Area Director must (i) be employed at such level by the for at least 50% of the applicable period and (ii) must be in good standing and actively employed when the bonus is paid.  Awards under the Manager and AD Incentive Plan are generally based on the actual performance of the store(s) or regions, as applicable, for which an eligible Manager or Area Director is responsible, but remains subject to discretion.  In 2024, the Debtors estimate that the average monthly payout was approximately $1,700 per eligible Employee under the Manager and AD Incentive Plan.  There are no amounts outstanding under the Manager and AD Incentive Plan as of the Petition Date.

(ii)    *RSC Incentive Plan*.  Employees at the Debtors' restaurant support center ("RSC Employees") are eligible to participate in an annual performance

incentive plan ("RSC Performance Incentive Plan").  Awards under the RSC Performance Incentive Plan are generally based on (i) the RSC Employee's annual compensation and (ii) the performance of the Debtors' business.  In 2024, the Debtors estimate that the average payout was approximately $3,500 per eligible Employee under the RSC Incentive Program.  There are no amounts outstanding under the RSC Performance Incentive Plan as of the Petition Date.

(iii)    *Catering Incentive Plan*.  Catering sales team members ("Catering Sale Team Members") are eligible to participate in a quarterly and annual performance incentive plan ("Catering Incentive Plan").  To be eligible to receive payment under the Catering Incentive Program, an eligible Catering Sale Team Member must (i) achieve their personal revenue target and (ii) be in good standing and actively employed when the bonus is paid.  Awards under the Catering Incentive Plan are generally based on the actual sales collected by the catering team for the applicable period.  In 2024, the Debtors estimate that the average payout was approximately $18,700 per eligible Employee under the Catering Incentive Program.  There are no amounts outstanding under the Catering Incentive Plan as of the Petition Date.

The Debtors believe the Non-Insider Employee Incentive Programs are integral to the Debtors' business operations because they align the interests of eligible Employees with those of the Debtors by linking payments under the Non-Insider Employee Incentive Programs to the overall performance and efficiency of the Debtors' operations.  Further, the Debtors believe that most Employees who are eligible for awards under the Non-Insider Employee Incentive Programs view such awards as an integral part of their overall compensation and rely on such awards to pay their living expenses and support their families.  As of the Petition Date, the Debtors do not believe they owe any amount on account of any Non-Insider Employee Incentive Program.  However, by the Wages Motion the Debtors request the authority, but not direction, to continue to honor any obligations under the Non-Insider Incentive Program in the ordinary course of business.

*(k)    Non-Insider Severance Program*.  The Debtors, in the ordinary course of business, provide severance for certain Employees on a discretionary basis pursuant to certain informal guidelines and applicable law (if any) (the "Non-Insider Severance Practice").  The Debtors' ability and flexibility to provide severance amounts and other benefits, at its discretion, is critical to maintaining positive Employee morale and loyalty.  Failure to continue the Non-Insider Severance Practice could cause premature Employee turnover, which could undermine the Debtors' ongoing efforts to operate inside a chapter 11 proceeding.  By the Wages Motion, the Debtors request authority, but not direction, to continue the Non-Insider Severance Practice and honor post-petition severance obligations in the ordinary course, but only with respect to non-Insider Employees whose employment with the Debtors will terminate post-petition.  For clarity, the Debtors are not seeking authority to pay severance for employees that were terminated before the Petition Date.

(l)    *Other Employee Programs*.  From time to time, the Debtors offer certain Employees various benefits at the sole cost of the Employee ("Other Employee Programs").

(i)    *Better Together Foundation*.  The Debtors operate an employee assistance program whereby Employees can choose to donate money from their paycheck into an emergency Employee fund held by non-Debtor affiliate Better Together Foundation (d/b/a Do the Right Thing Fund) (a not-for-profit corporation) ("Better Together Foundation").  Employees can either have a specified amount deducted from their paycheck, or they can make a one-time donation.  All of the money contributed is for the benefit of Employees experiencing hardship.  Eligible Employees can apply for a grant if their hardship meets certain criteria.  Grants can range from $100 to $3,500, with a lifetime cap per Employee of $3,500.  The Debtors require the Employee to provide invoices for expenses arising from the hardship and the Debtors pay those invoices directly up to the amount of the grant.  The Debtors request authority to continue providing this employee assistance program through its non-Debtor affiliate, the Better Together Foundation.

(ii)    *Wellness Reimbursement*.    The Debtors offer a wellness reimbursement program ("Wellness Reimbursement Program") whereby the Debtors reimburse wellness related expenses up to a certain amount for eligible Employees.  The Debtors pay the eligible Employees directly and are then reimbursed by United Healthcare up to $20,000 annually.  The Debtors are unaware of any amounts outstanding as of the Petition Date on account of the Wellness Reimbursement Program.

The Debtors are unaware of any amounts due and owing as of the Petition Date in connection with the Other Employee Programs.  By way of the Wages Motion, the Debtors request authority to pay any pre-petition obligations arising in connection with the Other Employee Programs and continue providing such benefit programs in the ordinary course of business during these chapter 11 cases.

***Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing (A) the Debtors to Pay Certain Prepetition Claims of Trade Claimants and (B) Procedures Related Thereto and (II) Granting Related Relief (the "Critical Vendors Motion")***

80.    The Debtors request for (a) the authority, but not direction, to pay certain prepetition claims of critical vendors (collectively, the "Critical Vendors" whose claims shall be identified herein collectively as the "Critical Vendor Claims") in an amount not to exceed

$2,000,000 on an interim basis (the "Interim Critical Vendor Claims Cap") and $2,661,000 on a final basis (the "Final Critical Vendor Claims Cap") and (b) granting related relief.

81.    Critical Vendors.  In order to operate their businesses, the Debtors depend on select Critical Vendors who can supply the necessary quality and type of goods and services in a timely fashion to enable the Debtors to provide top quality services to their customer base.  Any interruption in the provision of goods or services by the Critical Vendors—however brief—would disrupt the Debtors' operations and could cause irreparable harm to the Debtors' businesses, goodwill, employees, customer base, and market share.

82.    The Debtors have thoroughly reviewed their business relationships and identified the Critical Vendors, the loss of whose particular goods or services would cause immediate and irreparable harm to the Debtors' businesses.  The Debtors also reviewed their accounts payable and prepetition vendor lists to identify the Critical Vendors using the following criteria: (a) which vendors were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption, (b) the Debtors' ability to find alternative sources of services and the potential disruption or lost revenues while a new supplier or service provider was resourced, (c) which suppliers or vendors would be prohibitively expensive to replace, (d) which suppliers or vendors would present an unacceptable risk to the Debtors' operations given the volume of essential services or products that such suppliers provide and (e) whether a vendor meeting the foregoing criteria is able or likely to refuse to ship product to or perform services for the Debtors postpetition if its prepetition balances are not paid, considering, for example, whether the particular vendor is under a contractual obligation to perform.

83. The Debtors use a variety of vendors to provide food, marketing services, source and provide alcohol and other materials essential to operating the Debtors' business. In many instances, these Critical Vendors are the only vendors able to provide the services and goods required to meet the Debtors' operational needs without substantial delay as a result of the Debtors' historical reliance on these Critical Vendors. Anticipating this situation, the Debtors, with the assistance of their advisors, spent significant time prior to the Petition Date reviewing and analyzing their books and records, open accounts payable systems, and prepetition vendor lists to identify those vendors and suppliers that are in fact critical to the Debtors' operations, the loss of which could materially harm the Debtors' businesses or impair going-concern viability. These Critical Vendors have a detailed understanding of the Debtors' operations and products. Even if it were commercially practicable to replace and retrain new service providers, the efforts expended to locate and replace the current Critical Vendors and the time required to do so would detract from the goals of these Chapter 11 Cases, reducing recoveries for the Debtors, their creditors and all parties in interest. Any loss of these Critical Vendors during the time following the commencement of the Chapter 11 Cases will impair the Debtors' effort to preserve and maximize the value of their estates. Accordingly, to preserve the value of the Debtors' estates as a going concern through the Debtors' sale process, the Debtors must have the ability to assuage the concerns of the Critical Vendors by funding them without interruption.

84. If the Critical Vendors are not paid, their resulting unwillingness to continue to provide products or services even for a short period of time would cause an interruption of the Debtors' operations. Such an interruption would cause the Debtors irreparable harm, which would jeopardize the Debtors' restructuring efforts. Relatedly, paying the Critical Vendors would permit

the Debtors to maintain the value of the businesses and maximize value for the benefit of their creditors and stakeholders.  Therefore, the Debtors seek authorization to pay Critical Vendor Claims to ensure the Debtors' continued receipt of goods and services and favorable credit terms from the Critical Vendors.

85.    The Debtors estimate that, as of the Petition Date, the aggregate amount of the Critical Vendor Claims is approximately $2,661,000 of which $2,000,000 will be due and owing within twenty-one (21) days after the Petition Date.

### *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims Arising Under the Perishable Agricultural Commodities Act and (II) Granting Related Relief (the "PACA Motion")*

86.    The Debtors seek entry of an order, authorizing, but not directing, the Debtors, in their sole discretion, to pay in the ordinary course of business PACA Claims as such claims come due in an aggregate amount not to exceed $950,000.  The Debtors believe that a certain portion of the products they have purchased but not yet paid for may qualify as "perishable agricultural commodit[ies]" under the Perishable Agricultural Commodities Act of 1930 (as amended, modified, or supplemented from time to time, "PACA").  PACA provides various protections to fresh fruit and vegetable sellers, including the establishment of a statutory constructive trust (the "PACA Trust") consisting of a buyer's entire inventory of food or other derivatives of perishable agricultural commodities, the products derived therefrom and the proceeds related to any sale of the commodities or products (collectively, the "PACA Trust Assets").  *See id.*  § 499e(c)(2). Accordingly, payment of PACA Claims at this time will not prejudice or affect the amount available for distributions to other creditors of the Debtors.  Further, to ensure that the Debtors' supply of fresh produce continues uninterrupted, it is imperative that the Debtors are authorized to

pay all prepetition and postpetition PACA Claims in the ordinary course of business and consistent with the Debtors' historical practices.

87.     As of the Petition Date, the Debtors estimate that they owe holders of PACA Claims approximately $950,000, in the aggregate, for goods subject to PACA that were delivered prior to the Petition Date, and the Debtors expect to be invoiced for substantially all of that amount within twenty-one (21) days of the Petition Date.

88.     Any PACA Claimant who accepts payment from the Debtors in satisfaction of its valid PACA Claim will be deemed to have waived any and all claims of whatever type, kind, or priority, against the Debtors, their property, their estates, and any PACA Trust Assets for such PACA Claims, but only the extent that payment has been received by such PACA Claimant on account of its PACA Claims.

### *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Payment of Prepetition Claims of Section 503(b)(9) Vendors and (II) Granting Related Relief (the "503(b)(9) Motion")*

89.     The Debtors seek entry of an order (a) authorizing, but not directing, the Debtors in their sole discretion, to pay in the ordinary course of business the 503(b)(9) Claims of the 503(b)(9) Vendors as such claims come due in an aggregate amount not to exceed $3,220,000, under the circumstances described more fully below; (b) directing all banks to honor the Debtors' prepetition checks or electronic transfers for payment for the foregoing, and prohibiting banks from placing any holds on, or attempting to reverse any automatic transfers on account of the foregoing; and (c) granting related relief.  As of the Petition Date, the Debtors estimate that the 503(b)(9) Claims total approximately $3,220,000 from approximately 200 different 503(b)(9) Vendors.

90.     During the twenty (20) days prior to the Petition Date, the Debtors received Goods in the ordinary course of its business from certain vendors, suppliers, and distributors.  In the ordinary course of business, the 503(b)(9) Vendors provide the Debtors with Goods that are essential to its sustained operations in the short term and during the reorganization period.  If the 503(b)(9) Vendors are not paid in the ordinary course on account of their 503(b)(9) Claims, such 503(b)(9) Vendors may not provide the Debtors with post-petition trade credit and may refuse to continue providing the Debtors with Goods after the Petition Date.  Because the Debtors rely on the 503(b)(9) Vendors to deliver Goods necessary to operate, any delay or disruption in the continuous flow of Goods to the Debtors from the 503(b)(9) Vendors could result in the Debtors' inability to serve its customers.

91.     Moreover, certain of the 503(b)(9) Vendors also manage the Debtors' upstream supply chain, among other things, by entering into third party agreements with suppliers of discrete Goods, obtaining Goods from that supplier, warehousing Goods and subsequently apportioning and delivering them to each of the Debtors' store locations.  If the management and delivery of Goods to the Debtors is interrupted or altogether stopped, the Debtors will be unable to operate their restaurants and would suffer short- and long-term negative economic effects as a result.

92.     Without ongoing and uninterrupted operation of their businesses, the Debtors would be immediately and seriously disadvantaged given the highly competitive casual dining restaurant market segment in which they operate.  Any disruption in the Debtors' operations may lead to negative customer perception of the Debtors' brand and irreparable loss of business.  The stability and performance of the Debtors' business depends on, among other things, the Debtors' ability to retain the 503(b)(9) Vendors and to maintain their reputation, goodwill, and customer

loyalty.  Further, replacing the 503(b)(9) Vendors would, in many instances, be impossible during the pendency of these chapter 11 cases, and when possible, would result in substantial additional costs and delays for the Debtors and their estates that could materially harm the Debtors' going-concern value.

### *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Continue Prepetition Insurance and Workers' Compensation Policies and to Pay Prepetition Premiums and Related Obligations and (II) Granting Related Relief* (the "<u>Insurance Motion</u>")

93.     The Debtors request entry of an order, among other things, (a) authorizing them to maintain their insurance programs, insurance policies, insurance premium financing programs, workers' compensation program, surety bond program, and any related agreements, as such practices, programs, and policies were in effect as of the Petition Date and to pay, in their sole discretion, prepetition amounts accrued in connection therewith and (b) authorizing applicable banks and other financial institutions to receive, process, and pay any and all checks and other transfers related to such claims.

94.     <u>Insurance Policies</u>.   In connection with the operation of their businesses, the Debtors maintain various liability, property, professional, and other insurance policies that provide the Debtors with coverage related to, among other things, general liability, workers' compensation, excess liability, umbrella, directors' and officers' liability, liquor liability, property liability, crime, employment practices liability, medical stop-loss and automobile liability coverage (collectively, and as described more fully below, the "<u>Insurance Policies</u>") administered by various third-party insurance carriers (the "<u>Insurance Carriers</u>").  The Debtors maintain the Insurance Policies to help manage and limit the various risks associated with operating their businesses, which is essential to

the preservation of the value of the Debtors' estates.  The Debtors' Insurance Policies are listed on **Exhibit A** of the Insurance Motion.

95.      Pursuant to the Insurance Policies, the Debtors pay premiums based on fixed rates and are invoiced directly or indirectly by each Insurance Carrier, certain of which are paid through Lockton Companies Inc. (the "Insurance Broker"), as well as certain other obligations related thereto (including broker or advisor fees, taxes, surcharges or other fees associated therewith, collectively, the "Insurance Premiums").  The majority of the Debtors' Insurance Premiums are financed under the Premium Financing Agreement (as defined below) and are paid on an annual basis.  The Debtors pay fees (the "Brokerage Fees") to the Insurance Brokers and historically have spent approximately $155,000 annually on Brokerage Fees.  As of the Petition Date, the Debtors estimate that approximately $200,000 of Brokerage Fees will be due and owing.  By the Insurance Motion, the Debtors seek authority, but not direction, to satisfy all such Brokerage Fees in the ordinary course of business.

96.      The Debtors historically have spent approximately $2,050,000 annually on Insurance Premiums for the Insurance Policies, which premiums are generally financed through the Premium Financer (as defined below) or, in limited cases, paid directly annually.  The Debtors believe that, as of the Petition Date, there are no outstanding prepetition Insurance Premiums due on account of the Insurance Policies.

97.      Audits.  Certain of the Insurance Policies, including, without limitation, the general liability, automobile and workers compensation, are subject to premium audits at the end of their respective term ("Audits").  These Audits may result in additional prepetition Insurance Premiums being due and payable by the Debtors during the pendency of these chapter 11 cases (such

additional Insurance Premiums, "<u>Audit Amounts</u>").  As of the Petition Date, the Debtors do not owe any amounts on account of Audit Amounts relating to prior extensions of the Insurance Policies.  However, for the avoidance of doubt, by the Insurance Motion, the Debtors seek authority, but not direction, to satisfy all such Audit Amounts in the ordinary course of business.

98.    <u>Workers' Compensation</u>.  Under state law, the Debtors are required to maintain workers' compensation Insurance Policies to provide their employees with coverage for claims arising from or related to their employment with the Debtors.  In the ordinary course of business, the Debtors maintain workers' compensation insurance at the level required by statute for each U.S. state in which the Debtors conduct business (each a "<u>Workers' Compensation Program</u>," and collectively, the "<u>Workers' Compensation Programs</u>").  The various Workers' Compensation Programs are administered by (i) The Travelers Indemnity Company ("<u>Travelers</u>"), solely with respect to Workers' Compensation Claims (as defined below) arising on or prior to June 30, 2023, (ii) Gallagher Bassett Services Inc. ("<u>Gallagher</u>"), solely with respect to Workers' Compensation Claims (other than the Workers' Compensation Program in the state of Texas) arising on or after July 1, 2023, and (iii) Method Insurance ("<u>Method</u>"), solely with respect to the Workers' Compensation Program in the state of Texas.  The Insurance Carriers for the Workers' Compensation Programs are as follows: (i) Travelers, solely with respect to Workers' Compensation Claims arising on or prior to June 30, 2023, (ii) Starr Indemnity & Liability Company ("<u>Starr</u>"), solely with respect to Workers' Compensation Claims (other than those arising in the State of Texas) arising on or after July 1, 2023 and (iii) Method, solely with respect to the Workers' Compensation Program in Texas.  The Debtors pay all amounts related to Workers' Compensation Claims up to a fixed deductible in the amount of $150,000 per incident, in addition

to fixed annual premiums of approximately $195,000 (the "Workers' Compensation Premiums")
in the aggregate that are financed under the Premium Financing Agreement.

99.      Workers' Compensation Administration Fees.  Gallagher, Travelers and Method
either invoice the Debtors monthly or pull payment from the appropriate Loss Funds Account (as
defined below) for the administration fees arising in connection with the Workers' Compensation
Claims (as defined below) (collectively, the "Workers' Compensation Administration Fees").  The
Debtors estimate that they pay approximately $6,000 per month on average as a result of Workers'
Compensation Administration Fees.   As of the Petition Date, the Debtors estimate that
approximately $6,000 in Workers' Compensation Administration Fees remain outstanding.

100.      Workers' Compensation Loss Funds.    In connection with the Workers'
Compensation Programs, the Debtors separately fund three separate loss fund accounts as follows:
(i) a loss fund account controlled by Gallagher that holds approximately $43,000 ("Gallagher Loss
Fund Account") as of the Petition Date, (ii) a loss fund account controlled by Travelers that holds
approximately $75,000 as of the Petition Date ("Travelers Loss Fund Account") and (iii) a loss
fund account controlled by Method that holds approximately $10,000 as of the Petition Date (the
"Method Loss Fund Account", and together with the Gallagher Loss Fund Account and the
Travelers Loss Fund Account, the "Loss Fund Accounts").  The funds in the Loss Funds Accounts
are used to satisfy claims arising from the applicable Workers' Compensation Programs and costs
associated therewith ("the "Workers' Compensation Claims" and, collectively with the Insurance
Premiums, Brokerage Fees, Workers' Compensation Administration Fees, and other obligations
related thereto, "Insurance Obligations").   The Debtors estimate that they pay approximately
$20,000 per month on average as a result of Workers' Compensation Claims.

48

101.    As of the Petition Date, the Debtors estimate that there is an aggregate total liability of approximately $626,800 outstanding in connection with pending Workers' Compensation Claims.  However, the pre-petition liability for Workers' Compensation Claims will not be final until such amounts are invoiced and paid, so the Debtors seek authority, but not direction, to satisfy all pre-petition liability with respect to the Workers' Compensation Claims as it becomes due.  In addition, the Debtors request authorization to renew, modify or supplement the Workers' Compensation Programs or execute new workers' compensation insurance in the ordinary course of business.  By the Insurance Motion, the Debtors seek authority, but not direction, to satisfy all pre-petition liability with respect to the Workers' Compensation Programs as such amounts become due, including, without limitation, the Workers' Compensation Administration Fee and reimbursement of the Loss Fund Accounts.

102.    Additionally, certain states statutorily require the Debtors to obtain workers' compensation insurance from the applicable state government on account of the individuals employed by the Debtors in such state and make de minimis payments on account of claims.  The Debtors pay workers' compensation insurance premiums directly to the applicable governmental entity in Ohio ("State Workers' Compensation Premiums") in connection with each such state's workers' compensation scheme.  The Debtors are at times required to make *de minimis* payments to third-party administrators and other services in those states in connection with workers' compensation claims ("State Workers' Compensation Claim Payments," together with the State Workers' Compensation Premiums, the "State Workers' Compensation Payments").  The Debtors are unaware of any material amounts due and owing as of the Petition Date on account of State Workers' Compensation Payments.  However, the Debtors seek authority, but not direction, to

satisfy all pre-petition liability with respect to the State Workers' Compensation Payments as it becomes due.

103.    <u>The Insurance Premium Financing Program</u>.  Because it is not always economically advantageous for the Debtors to pay the Insurance Premiums on a lump-sum basis, the Debtors finance the majority of their Insurance Premiums, pursuant to that certain Premium Financing Agreement – Promissory Note, dated as of December 18, 2024 (the "<u>Premium Financing Agreement</u>"), by and between OTB Acquisition LLC and AFCO Credit Corporation (the "<u>Premium Financier</u>").  The Premium Financing Agreement provides financing for all of the Debtors' Insurance Policies except for flood and liquor liability policies (the "<u>Financed Policies</u>").

104.    Pursuant to the terms of the Premium Financing Agreement with the Premium Financier, the Debtors are required to make eleven (11) monthly installments to the Premium Financier of $192,666.33 each toward the balance of the financing over the term of the Premium Financing Agreement.  For the Financed Policies, the initial payment of $192,666.33 under the agreement was made on or around January 1, 2025.  The Debtors have a remaining balance of $1,733,997 (reflecting nine (9) monthly payments).  The amount financed under the Premium Financing Agreement accrues interest at an annual fixed rate of 7.48%.

105.    Pursuant to the Premium Financing Agreement, certain of the Debtors granted the Premium Financier a security interest in, among other things, any and all unearned premiums and dividends that may become payable for any reason under the financed Insurance Policies.  If the Debtors do not satisfy their obligations under the Premium Financing Agreement, the Premium Financier has the right, subject to the automatic stay, to, among other things, terminate any covered Insurance Policies.

106.   By the Insurance Motion, the Debtors request authority to continue honoring their obligations to the Premium Financier in the ordinary course of business, including authority to pay any amounts that may be due and owing or that come due and owing under the Premium Financing Agreement. In addition, the Debtors request authorization to renew, modify or supplement the Premium Financing Agreement or execute new Premium Financing Agreement in the ordinary course of business.

107.   Letter of Credit. The Debtors have approximately $1,090,000 of outstanding letters of credit ("Letters of Credit"), all issued by 1970 Group, Inc. ("1970 Group"), which the Debtors posted in favor of certain Insurance Carriers for their Workers' Compensation Programs and commercial automobile policy and to secure the outstanding liability pursuant to the Workers' Compensation Claims and claims arising under the commercial automobile policy. The Letters of Credit are not currently cash collateralized. As of the Petition Date, the Debtors do not believe there are any payments due and owing on account of the Letters of Credit and the Debtors are not aware of any pending requests for payment on the Letters of Credit. The Debtors request authority to honor the current Letters of Credit and renew, replace, modify, extend, or add to the Letters of Credit as needed postpetition, including through the issuance of new letters of credit or the posting of cash collateral.

108.   Surety Bond Program. In the ordinary course of business, the Debtors are required to provide various types of surety bonds ("Surety Bonds") to secure obligations owed to various third parties, including municipalities, state and federal governmental units, and public agencies, relating to their operations (the "Surety Bond Program"). The various bonds provided by the Debtors are listed on **Exhibit B** attached to the Insurance Motion.

109.    Pursuant to their Surety Bond Program, in the ordinary course of business, the Debtors are required to provide Surety Bonds to certain third parties (the "Obligees"), including governmental units and other public agencies, to secure the Debtors' payment or performance of certain obligations in connection with license and permits and sales and use taxes.  In particular, the Debtors are required to purchase Surety Bonds in compliance with applicable state regulations relating to liquor licenses and permits for operating restaurants.  The Surety Bonds are issued by certain sureties (each, a "Surety" and collectively, the "Sureties") including, without limitation, Travelers Casualty and Surety Company of America.  The Debtors estimate that as of the Petition Date, the total face principal amount of all Surety Bonds is approximately $158,800, consisting of six (6) Surety Bonds with an average face amount of approximately $26,500.

110.    The Debtors maintain the necessary surety bond coverage through various surety bond policies (the "Surety Policies"), under which the Debtors have certain obligations (the "Surety Obligations", and together with the Insurance Obligations, the "Insurance and Surety Obligations"), including the payment of annual premiums to the Sureties (the "Surety Premiums").  The Surety Premiums are determined based upon a fixed rate and total of approximately $2,000 per year in the aggregate.  The Debtors remit premium payments when the bonds are issued or renewed on an annual basis.

111.    The Debtors believe that no Surety Premiums or amounts on account of other Surety Obligations are outstanding as of the Petition Date.  Accordingly, by the Insurance Motion, the Debtors seek authority, but not direction, to pay any such Surety Premiums and any other Surety Obligations that may become due and owing during these chapter 11 cases in the ordinary course.

112.     As a condition to issuing the bonds, certain of the Sureties require that the Debtors enter into indemnity agreements (collectively, the "Indemnity Agreements"), pursuant to which the Sureties are indemnified from any loss, cost, or expense that the Sureties may incur on account of the issuance of any bonds on behalf of the Debtors.  The Debtors seek authority to continue to honor and make payments on account of such indemnification obligations irrespective of whether such indemnification obligations arose during or relate to the prepetition period.

***Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Related Obligations and (II) Granting Related Relief (the "Taxes Motion")***

113.     In the ordinary course of operating their business, the Debtors incur (a) certain sales, use, trust fund, property, and other taxes (collectively, the "Taxes") and (b) various business license, permit, and other fees (collectively, the "Fees") payable to various federal, state and local taxing and regulatory authorities (collectively, the "Taxing Authorities").

114.     As of the Petition Date, the Debtors estimate that, collectively, they owe the various Taxing Authorities approximately $6,130,000 in prepetition Taxes and Fees.  The table in the Taxes Motion describes the various categories of Taxes and Fees incurred by the Debtors in the ordinary course of business and includes good faith estimates of such Taxes that have accrued as of the Petition Date based on the Debtors' books and records and remain subject to potential audits and other adjustments.[8]

---

[8]    As of the Petition Date, the Debtors have also incurred prepetition state and federal payroll land employment-related Taxes in the ordinary course of business and that such Taxes are owed (but not yet paid), to the Taxing Authorities pursuant to the Debtors' payroll.  The Debtors do not seek authority to collect and pay state and federal employee withholding taxes under the Taxes Motion, but rather request such authority as part of the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Payment of Prepetition Wages, Payroll Taxes, Certain Employee Benefits, and Related Expenses; (II) Directing Banks to Honor Related Prepetition Transfers; and (III) Granting Related Relief* filed concurrently herewith.

115.    <u>Sales and Use Taxes</u>.  The Debtors incur and collect from their customers a variety of state and local sales taxes, gross receipts taxes and similar obligations in connection with sales of various products and services in Debtors' restaurants (the "<u>Sales Taxes</u>").  The Debtors collect and remit or otherwise pay the Sales Taxes as needed to the applicable Taxing Authorities.  The Debtors also incur use taxes on account of purchasing various inventory, raw materials, supplies or other goods used in the ordinary course of the Debtors' business (the "<u>Use Taxes,</u>" together with the Sales Taxes, the "<u>Sales and Use Taxes</u>").  In 2024, the Debtors paid approximately $14,300,000 in aggregate on account of Sales and Use Taxes to the applicable Taxing Authorities. The Debtors estimate that they owe approximately $1,500,000 in accrued and unpaid Sales and Use Taxes as of the Petition Date, of which $1,260,000 will become due within twenty-one (21) days following the Petition Date.  Accordingly, the Debtors request authority, but not direction, to satisfy any amounts owed on account of such Sales and Use Taxes that may become due and owing in the ordinary course of business during their chapter 11 cases.

116.    <u>Franchise Taxes and Income Taxes</u>.  The Debtors pay franchise, net worth and similar taxes ("<u>Franchise Taxes</u>") and income taxes ("<u>Income Taxes</u>", and together with Franchise Taxes, the "<u>Franchise and Income Taxes</u>") to various Taxing Authorities to maintain the right to operate their business in the applicable taxing jurisdiction.  The Debtors estimate that they owe approximately $250,000 in accrued and unpaid Franchise and Income Taxes as of the Petition Date, of which $20,000 will become due within twenty-one (21) days following the Petition Date. Accordingly, the Debtors request authority, but not direction, to satisfy any amounts owed on account of such Franchise and Income Taxes that may become due and owing in the ordinary course of business during their chapter 11 cases.

117.    <u>Real Estate and Property Taxes</u>.  State and local laws in many of the jurisdictions where the Debtors operate generally grant the applicable Taxing Authorities the power to levy property taxes against the Debtors' personal property (collectively, the "<u>Property Taxes</u>"). Additionally, certain of the Debtors' leases provide that the Debtors will remit applicable Property Taxes for the leased property directly to the appropriate Taxing Authorities.  To avoid the imposition of statutory liens on their personal property, the Debtors typically pay Property Taxes on property that they own in the ordinary course of business.  The Debtors generally pay Property Taxes by paying Taxing Authorities through their tax advisor, Ryan LLC, or directly via checks, electronic funds transfers or ACH.  If the Property Taxes are not paid to the Taxing Authorities, certain states have historically revoked or otherwise terminated the liquor licenses issued by such states, resulting in disruption of the Debtors' business operations.  The Debtors estimate that they have accrued approximately $4,350,000 in Property Taxes as of the Petition Date, of which $1,250,000 will become due within twenty-one (21) days following the Petition Date.  Accordingly, the Debtors request authority, but not direction, to satisfy any amounts owed on account of such Property Taxes that may become due and owing in the ordinary course of business during their chapter 11 cases.

118.    <u>Other Taxes and Fees</u>.  Applicable federal, state, and local laws and regulations require the Debtors to pay taxes and fees for a wide range of annual reports, import taxes, business licenses, liquor licenses and permits.  The Debtors also incur certain annual tax reporting, privilege fees and filing related fees (collectively, the "<u>Other Taxes and Fees</u>").  The Debtors estimate that they have accrued approximately $30,000 in the aggregate of Other Taxes and Fees as of the Petition Date, of which all will become due within twenty-one (21) days following the Petition

Date.  Accordingly, the Debtors request authority, but not direction, to satisfy any amounts owed on account of such Other Taxes and Fees that may become due and owing in the ordinary course of business during their chapter 11 cases.

119.    <u>Audits</u>.  The Debtors are subject to certain ongoing audit investigations of prior year tax returns and may be subject to further investigations (the "<u>Audits</u>") during the pendency of these chapter 11 cases.  These Audits may result in additional prepetition Taxes being assessed against the Debtors (such additional Taxes, "<u>Audit Amounts</u>"), though the Debtors will use their best efforts to avoid any such additional liability.  The Debtors seek authority, but not direction, to satisfy any such Audit Amounts in the ordinary course of business.

***Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Service on Account of Prepetition Invoices; (II) Deeming Utilities Adequately Assured of Future Performance; (III) Establishing Procedures for Determining Adequate Assurance of Payment; and (IV) Granting Related Relief* (the "<u>Utilities Motion</u>")**

120.    The Debtors respectfully request the entry of an interim and final order: (a) prohibiting the Utility Providers from altering, refusing, or discontinuing service on account of prepetition invoices; (b) deeming utilities adequately assured of future performance; (c) establishing the Determination Procedures for determining adequate assurance of payment; and (d) granting related relief.

121.    Utility services are essential to the Debtors' ability to sustain their operations while these chapter 11 cases are pending.  To operate their business and manage their properties, the Debtors incur utility expenses for natural gas, electricity, water, sewage, waste management, local and long-distance telecommunications and other similar services (collectively, the "<u>Utility</u>

Services"). These Utility Services are provided by approximately 150 utility providers (the "Utility Providers"), with which Debtors may have multiple accounts.

122. The Debtors make utility payments in multiple forms: (i) direct payment to certain applicable Utility Providers; (ii) through Utility Managers (as defined below); or, in some cases, (iii) through certain of the Debtors' landlords in connection with the Debtors' real property lease payments. The Debtors spend an aggregate amount of approximately $525,212 each month on Utility Services from the Utility Providers.

123. The Utility Managers. Primarily to manage the Utility Services at their many locations, the Debtors contract with certain third-party processors: Cass Information Systems, Inc. ("Cass") and certain waste utility managers (the "Waste Managers", and together with Cass, each a "Utility Manager" and collectively, the "Utility Managers"). Cass manages the Debtors' accounts for the majority of the Utility Providers and Services, including gas, electricity and water. The Waste Managers manage the Debtors' accounts for the majority of the Debtors' waste management providers. Together, the Utility Managers manage approximately 150 utility accounts for the Debtors. The Utility Managers receive, process, and code the Debtors' utility bills in the ordinary course of business to centralize and facilitate timely and accurate payment (the "Manager Utility Payments") on behalf of the Debtors as their agent and provide accounting information to the Debtors with respect to the Utility Services that they manage. As of the Petition Date, the Debtors estimate that approximately $250,000 of Manager Utility Payments remain outstanding and payable.

124. As compensation for these services, the Debtors pay the Utility Managers an average monthly fee of approximately $100,000 in the aggregate in addition to certain additional

fees charged for specific services (all payments collectively, the "Service Fees", together with the Utility Payments and Manager Utility Payments, the "Utility Obligations"). As of the Petition Date, the Debtors estimate that approximately $100,000 of Service Fees, all of which will become due within twenty-one (21) days following the Petition Date. By the Utilities Motion, the Debtors request authority, but not direction, to pay all prepetition Service Fees in the ordinary course of business.

125. Payment of prepetition Service Fees to the Utility Managers will ensure that the Utility Managers will continue to provide necessary services to the Company (including ongoing sourcing of certain utilities on an urgent basis, as needed) and remit the Manager Utility Payments to the Utility Companies without delay, service interruption, or logistical complication. Therefore, it is critical that the Debtors be permitted to honor prepetition Service Fees owed to the Utility Manager.

126. <u>Landlord Utility Companies</u>. Finally, in certain cases, some Utility Services are billed directly to the Debtors' landlords (the "<u>Landlords</u>" and such utility companies, the "<u>Landlord Utility Companies</u>") and the associated costs are passed through to the Debtors as part of the real property lease payments in accordance with the applicable lease agreement. As it relates to the Landlord Utility Companies, the Debtors respectfully request that, notwithstanding any current or future nonpayment, deferral, waiver, or other compromise of rent, the Landlords be authorized to continue to pay for any and all Utility Services offered through the Landlord Utility Companies in the ordinary course until the effective date of any rejection of the applicable lease agreement, if any, pursuant to section 365 of the Bankruptcy Code.

127.    Additionally, certain third parties, often governmental units or other public agencies, have required the Debtors to post surety bonds or deposits to secure the Debtors' payment or performance of certain obligations. The obligations secured by these bonds and deposits include the Debtors' obligations to pay certain Utility Services.

128.    Continued and uninterrupted Utility Services is vital to the Debtors' ability to sustain their operations during these chapter 11 cases. Because of the nature of the Debtors' operations, termination or interruption of the Debtors' utility service would dramatically impair the Debtors' ability to conduct business and would cause considerable inconvenience to the Debtors' customers and employees. If Utility Providers are permitted to terminate or disrupt service to the Debtors, the Debtors' primary revenue source would be threatened.

### *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Honor Prepetition Obligations to Customers and Otherwise Continue Customer Programs in the Ordinary Course of Business and (II) Granting Related Relief* (the "<u>Customer Programs Motion</u>")

129.    The Debtors request entry of an order, (a) authorizing, but not directing, the Debtors, in their sole discretion, to pay, honor, or otherwise satisfy prepetition obligations to customers and to otherwise continue prepetition customer practices and programs in the ordinary course of business; (b) authorizing, but not directing, the Debtors, in their sole discretion, to pay, honor, or otherwise satisfy prepetition processing costs and fees associated with these practices and programs; (c) authorizing and directing the Debtors' banks and financial institutions (collectively, the "<u>Banks</u>") to receive, process, honor and pay all checks and electronic payment requests relating to the foregoing; and (d) granting related relief. As of the Petition Date, the Debtors estimate that there are approximately $4,306,200 of outstanding Customer Program Obligations, which could be exercised in the ordinary course of the Debtors' restaurant business.

130.    To attract new customers, and to reward and provide incentives to existing customers, the Debtors employ, in the ordinary course of business, certain programs, promotions, and practices described herein.  The Debtors' ability to continue the Customer Programs and honor obligations related thereto is necessary to keep the Debtors' reputation intact, meet competitive market pressures, ensure customer satisfaction, and ultimately, maximize value for the Debtors' estates and stakeholders.

131.    The Customer Programs include: (i) coupons and sales promotions; (ii) a gift card program; (iii) the Border Reward Program; (iv) the catering program; and (v) Charitable Programs.

132.    The Coupons and Sales Promotion.  On The Border Mexican Grill & Cantina ("On The Border") competes and markets its brand in the casual dining market.  As part of the Debtors' marketing efforts in the casual dining market segment, the Debtors offer various in-store and online sales promotions (the "Sales Promotions").  The Debtors also maintain a coupon redemption program pursuant to which they distribute coupons in-store, online or in electronic mailings (collectively, the "Coupons" and together with the Sales Promotions, the "Coupons and Sales Promotions").  The Coupons include vouchers distributed pursuant to certain Sales Promotions and bonus coupons distributed pursuant to certain gift card sales.  To preserve the goodwill of On The Border's customer base, the Debtors seek authorization to honor the Coupons issued prior to the Petition Date and to continue the Coupons and Sales Promotions in a manner consistent with ordinary business practices.

133.    Based on prior practice and current utilization of the Coupons and Sales Promotions, the Debtors estimate that the entire amount of extant prepetition Coupons and Sales Promotions that the Debtors request to honor in the ordinary course will not exceed $1,900,000.

134.    <u>The Gift Card Program</u>.  The Debtors maintain programs by which their customers can purchase gift cards at any On The Border location nationwide, online at www.ontheborder.com/gift-cards/, or through participating third-party retailers and distributors, and redeem such gift cards at any On The Border location (the "<u>Gift Card Program</u>").  In each instance, customers can purchase prepaid, no-fee gift cards (the "<u>Gift Cards</u>") in customizable denominations up to $500 to be used at the Debtors' restaurants.

135.    The Debtors are party to a gift card agreement ("<u>Gift Card Agreement</u>") with Brinker Services Corp. ("<u>Brinker</u>") whereby the Debtors partner with Brinker to maintain, sell and service co-branded Gift Cards with Brinker owned restaurants pursuant to the terms of the Gift Card Agreement.  In accordance with the Gift Card Agreement, (i) On The Border sells Gift Cards co-branded with On The Border and the Brinker-owned restaurant chains in the Debtors' restaurants (the "<u>OTB Gift Cards</u>") and (ii) Brinker sells co-branded Gift Cards online and through third-party retailers (e.g., shopping centers, kiosks, grocery stores, and third-party restaurants) (the "<u>Third-Party Retailers</u>") (the "<u>Brinker Gift Cards</u>").  Customers can redeem and use the Brinker Gift Cards at the Debtors' restaurants just as they do with the OTB Gift Cards.  The Debtors maintain a liability for the OTB Gift Cards and pay Brinker service fees on account of servicing all Gift Cards.  Comparatively, Brinker maintains the liability for the Brinker Gift Cards and reimburses the Debtors on a monthly basis on account of any Brinker Gift Cards that are redeemed at one of the Debtors' restaurants.  As a result, at the end of each month, Brinker reconciles the outstanding Gift Card liability, including netting out any service fees owed to Brinker by the Debtors, and satisfies any outstanding liability to the Debtors on account of the Gift Card Program.

136.     As of the Petition Date, the maximum outstanding potential liability on account of the OTB Gift Cards is approximately $1,700,000.  Based on the general customer usage in the casual dining industry, the Debtors believe that any customer claims arising under the Gift Card Program are likely entitled to priority over other general unsecured claims pursuant to section 507(a)(7) of the Bankruptcy Code, up to $3,350 per individual, because individual customers do not typically hold gift cards in aggregate amounts exceeding the statutory cap.

137.     Accordingly, the Debtors seek authority to (i) maintain the Gift Card Program and to honor all Gift Cards purchased or given away to customers, including any Gift Cards that were issued prior to the Petition Date and (ii) continue to satisfy the Debtors' obligations under, and related to, the Gift Card Agreement.

138.     <u>Border Rewards Program</u>.  The Debtors administer a two-tier (Silver and Gold) customer loyalty program, known as the "<u>Border Rewards Program</u>."  Through the Border Rewards Program, customers have the ability to determine their tier status based on level of participation and annual spend at On The Border.  As of the Petition Date, there are approximately 900,000 members in the Border Rewards Program, with approximately 585,000 active members that hold over 21,000,000 points in the aggregate.  The Border Rewards Program is a strategic way of incentivizing customer loyalty and repeat visits by providing added value to customers.  The Debtors utilize the Border Rewards Program in two manners: (i) as a rewards-based loyalty program designed to drive marginal sales through data-driven offers and (ii) as a brand-owned channel for efficiently communicating with customers to increase engagement.  As part of the Border Rewards Program, rewards are loaded into the accounts of members who achieve sufficient points and spending required to receive them.

139.    As of the Petition Date, the Debtors estimate that total liabilities for the Border Rewards Program are $500,000.  Based on historical data, the Debtors estimate that customer utilization of the Border Rewards Program will convert to an average monthly liability of $41,667. The Debtors' continued participation in the Border Rewards Program is both (a) fundamentally important to the continued operation of On The Border restaurants and (b) a critical means of maintaining customer loyalty from existing customers and attracting new customers.  Accordingly, by way of the Customer Programs Motion, the Debtors seek authority to continue the Border Rewards Program in the ordinary course of business.

140.    <u>Third Party Food Delivery Service Providers</u>.  The Debtors also engage in a robust to-go order business through the use of its website (the "<u>Debtor In-Store To-Go Infrastructure</u>") and through strategic relationships with popular third-party food delivery service providers, including Uber Eats, Door Dash, GrubHub and others (collectively, the "<u>Third-Party Food Delivery Service Providers</u>").  The Debtors' online ordering and delivery platform is serviced by OLO, Inc. ("<u>OLO</u>").  On average, the Debtors pay OLO approximately $55,000 per month on account of the services OLO provides.  As of the Petition Date, the Debtors estimate that they owe approximately $55,000 in fees to OLO.  The Debtors seek authority, but not direction, to satisfy any prepetition amounts to be paid in the ordinary course in connection with the Debtor In-Store To-Go Infrastructure.

141.    <u>Catering Deposits</u>.  The Debtors offer a one-stop, robust catering shop for their customers ("<u>Catering Program</u>").  In connection with the Catering Program, the Debtors' collect deposits from their Catering customers that may be required to be returned by the Debtors in certain circumstances.  As of the Petition Date, the Debtors estimate that they are holding approximately

$1,200 in Catering Deposits, some of which may be required to be returned to the customer in certain situations.  Accordingly, out of an abundance of caution, the Debtors seek authority, but not direction, to satisfy any Catering Deposits or other expenses related to the Catering Program in the ordinary course of business.

142.    <u>Charitable Programs</u>.  From time to time, the Debtors sponsor certain charitable programs either by facilitating and encouraging customer donations to certain sponsored charities or by donating a portion of the sales made in connection with a fundraiser (each a "<u>Charitable Program</u>" and collectively, the "<u>Charitable Programs</u>").  As of the Petition Date, the Debtors estimate that total liabilities for the Charitable Programs are $150,000.  Any postpetition expenditures associated with the Charitable Programs will be (i) consistent with the Debtors' historic expenditures, (ii) made in the ordinary course of business and (iii) will be part of any approved budget in connection with the Debtors' postpetition financing and use of cash collateral.

143.    The Debtors believe that the positive impact on the communities they serve, coupled with customer goodwill and increased foot traffic generated by the Charitable Programs, warrants their continued sponsorship on a postpetition basis, including honoring any related outstanding obligations that arose prior to the Petition Date.  Customers, employees and partners who make donations to the Charitable Programs expect the Debtors to honor their representations regarding the use of such donations or otherwise continue operating such Charitable Programs. Failing to do so would tarnish the Debtors' reputation and customer relationships during an already sensitive, transitional time for the Debtors' businesses.  Certain donations made under the Charitable Programs are held in trust by the Debtors on behalf of the charities and consequently may not be considered property of the Debtors' estates.

***Debtors' First Omnibus Emergency Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases of Non-Residential Real Property Effective As Of the Petition Date, (B) Abandonment of Any Remaining Personal Property Located at the Leased Premises; (II) Fixing a Bar Date for Claims of Counterparties; and (III) Granting Related Relief* (the "<ins>Lease Rejection Motion</ins>")***

144.     The Debtors request entry of an order (a) authorizing and approving the Debtors' rejection of the leases set forth on <ins>**Exhibit A**</ins>  of the Lease Rejection Motion (the "<ins>Rejected Leases</ins>") effective as of the Petition Date; (b) confirming that any personal property of the Debtors, including, but not limited to, furniture, fixtures, and equipment remaining at each Leased Premises ("<ins>Personal Property</ins>"), as of the Petition Date or otherwise within the time agreed upon by and among the Debtors and the Counterparty (as defined below) of the applicable Leased Premises (unless extended by agreement among the Debtors and the applicable Counterparty), on the premises (collectively, the "<ins>Leased Premises</ins>") are deemed abandoned by the Debtors pursuant to section 554 of the Bankruptcy Code without the applicable Counterparty incurring liability to any person or entity, and upon such abandonment at the time of the rejection of the applicable lease for the Leased Premises, the applicable Counterparty shall be permitted to use or dispose of such abandoned Personal Property remaining at such Leased Premises without notice or liability to the Debtors or any third person or entity; and (c) fixing a bar date for claims, if any, of the counterparties to each Rejected Lease (the "<ins>Counterparties</ins>").

145.     The Debtors currently operate approximately sixty (60) casual Mexican dining restaurants located across the United States.  The Debtors do not own any premises on which they operate their restaurants but rather enter into non-residential property lease agreements with the respective counterparties.  In the weeks leading up to the Petition Date, the Debtors have accelerated their lease rationalization process in connection with the Debtors' broader restructuring

efforts.  The Debtors reviewed their store footprint and identified leases that are likely to continue to drive losses for the Debtors and should be rejected.  The Debtors' meticulous, well-considered lease rejection plan is centered on value maximization.

146.    <u>Rejected Leases</u>.  The Debtors have concluded that the Rejected Leases are not necessary for a sale and have determined that continued performance under the Rejected Leases would constitute an unnecessary drain upon the financial resources of the Debtors' cash (on account of February 2025, March 2025 rent, and all subsequent rents, and any related expenses for the Rejected Leases that would otherwise accrue).  In order to manage their business and assets responsibly and economically, the Debtors seek to reject the Rejected Leases which are a burden on the Debtors and their estates.  In 2024, the Company spent approximately $25,315,000 in lease obligations, over $11,878,000 of which relate to underperforming stores.  The Rejected Leases and the Personal Property (as defined below) remaining at the Leased Premises have no value or benefit to the estates and will not be included as part of the assets for sale in these chapter 11 cases.

147.    Debtors are no longer occupying, nor have use for, the Leased Premises (as defined below).  The Rejected Leases require the payment of base monthly rent, applicable sales taxes, and prorated common area and real estate tax expenses associated with each applicable location.  As a result, the Rejected Leases and the Personal Property (as defined below) remaining at the Leased Premises have no value or benefit to the estates and will not be included as part of the assets for sale in these chapter 11 cases.

***Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postposition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief*** (the "<u>**DIP Motion**</u>")

148.    The Debtors seek entry of an order authorizing the Debtors to enter into a senior secured superpriority delayed multiple-draw term loan facility in the aggregate principal amount of $14 million (the "<u>DIP Facility</u>"), comprised of: (a) upon entry of the Interim DIP Order, $11.5 million, including $7.5 million of new money DIP Loans (the "<u>Interim Advance</u>"), plus a roll-up and conversion into DIP Loans of $4 million of the outstanding principal balance under the Prepetition Secured Note (the "<u>Roll-Up</u>") and (b) upon entry of a Final DIP Order, an additional $2.5 million of new money DIP Loans (for a total of $10 million of new money DIP Loans).

149.    As set forth in more detail in the *Declaration of Jonathan Tibus in Support of the Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior and Junior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "<u>Tibus Declaration</u>"), the Debtors believe that entering into the DIP Facility is the best option available to the Debtors and will maximize the value of the Debtors' estates by allowing the Debtors to operate in the ordinary course while pursuing a sale transaction during the pendency of the Chapter 11 Cases, and therefore is a sound exercise of the Debtors' business judgment.

*[Remainder of Page Intentionally Blank]*

Under penalty of perjury, I declare that the foregoing is true to the best of my knowledge

and belief.

Dated: March 5, 2025                                  /s/ *Jonathan Tibus*
      Atlanta, Georgia                                  Jonathan Tibus
                                   Chief Restructuring Officer

**<u>Exhibit A</u>**

**Corporate Structure Chart**

ON THE BORDER MEXICAN GRILL & CANTINA

[1] The depiction of the non-Debtor entities is based on the Debtors' knowledge and belief as of March 4, 2025.





